*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CF-1132


LANDON R. MAYO, APPELLANT,


V.


UNITED STATES, APPELLEE.


Appeal from the Superior Court
of the District of Columbia
(2016-CF2-017614)

(Hon. José M. López, Trial Judge)

(Argued En Banc June 6, 2023)　　　　　　　Decided May 23, 2024)

*Sean R. Day* for appellant.

*Jaclyn S. Frankfurt*, Public Defender Service, with whom *Samia Fam* and *KC Bridges*, Public Defender Service, were on the brief as amicus curiae in support of appellant.

*Timothy R. Cahill*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, *Chrisellen R. Kolb*, *Monica Dolin*, and *Meredith E. Mayer-Dempsey*, Assistant United States Attorneys, were on the brief for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH, EASTERLY, MCLEESE, DEAHL, HOWARD, and SHANKER, *Associate Judges*.

Opinion for the court by *Associate Judge* EASTERLY, with whom BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH, DEAHL, HOWARD, and SHANKER, *Associate Judges*, join.

Dissenting opinion by *Associate Judge* MCLEESE at page 67.

EASTERLY, *Associate Judge*: Based on an assessment of the totality of the circumstances, a division of this court held that Landon Mayo was seized in violation of his Fourth Amendment rights by the Metropolitan Police Department's Gun Recovery Unit ("GRU") and reversed his convictions on that basis. *Mayo v. United States*, 266 A.3d 244 (D.C. 2022). According to the government's witness at the suppression hearing, nineteen-year-old Mr. Mayo was "just hanging out" with some people in an alley in the Kenilworth neighborhood when three GRU officers who were part of a two-car team pulled up. The officers exited their vehicle and focused their attention on Mr. Mayo, who, like others in the alley, had moved away from the police. The officers followed Mr. Mayo and told him they just wanted to talk—but then asked if he had a gun. When Mr. Mayo started to run, one officer dove to tackle him. Although the officer got a hand on Mr. Mayo's foot and tripped him up, Mr. Mayo managed to continue running. He was apprehended a short distance away by GRU officers from the other car. The GRU officers subsequently recovered a gun and drugs they believed Mr. Mayo to have discarded or handed off to others in flight.

The government sought review of the division's holding that the GRU officers violated Mr. Mayo's Fourth Amendment rights to be free from unreasonable searches and seizures, arguing that it conflicted with the Supreme Court's decision in *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000). The government argued that, under *Wardlow*, flight from police in a "high-crime area" alone gives police the requisite reasonable articulable suspicion to conduct a brief stop of an individual under *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). This en banc court granted the government's request for review and vacated the division's decision. *Mayo v. United States*, 284 A.3d 403 (D.C. 2022). After receiving further briefing and hearing argument, the en banc court again holds that the GRU's seizure of Mr. Mayo was unjustified and unconstitutional.

With this opinion, we first reaffirm the division's predicate holding, uncontested by the government, that Mr. Mayo was seized when the GRU officer dove to tackle him and grabbed his foot, even though he got away. This holding is compelled by *Torres v. Madrid*, 592 U.S. 306 (2021), which effectively overruled this court's decision in *Henson v. United States*, 55 A.3d 859 (D.C. 2012). Second, we reject the government's interpretation of *Wardlow* as authorizing police to make *Terry* stops whenever they perceive anyone seeking to evade them in an area labeled "high crime." We hold, in keeping with our understanding of *Wardlow*, that (1) in assessing reasonable articulable suspicion, flight must be examined in the context of

the totality of the circumstances and (2) general locational crime evidence, if relevant and nonconclusory, may provide context for police observations of ambiguous conduct, but its appropriate weight will turn on its quality and specificity. Applying this framework, we reaffirm the division's conclusion that Mr. Mayo's rights under the Fourth Amendment were violated. Lastly, because the government did not seek en banc review on this question, we reinstate the division's holding that the items of physical evidence subsequently recovered by the police from Mr. Mayo's person and in the area of the chase were fruits of his unlawful seizure that must be suppressed. *See* Appellee's Petition for Rehearing or in the Alternative Rehearing En Banc, dated April 19, 2022. We also reinstate Associate Judge McLeese's dissent to that holding.

## I.     Facts and Procedural History

### A.     Suppression Hearing

At the hearing on Mr. Mayo's motion to suppress, the government presented testimony from Sergeant José Jaquez, one of the seven GRU officers who participated in Mr. Mayo's seizure and subsequent arrest. Sergeant Jaquez was the officer who dove to tackle Mr. Mayo and briefly got a hand on him. Other GRU officers re-seized and arrested Mr. Mayo and recovered a gun and drugs from his flight path, and Sergeant Jaquez testified to what these officers told him. As

Sergeant Jaquez explained, there was no body-worn camera footage of the GRU officers' encounter with Mr. Mayo because they did not start wearing body-worn cameras until the following year.

Sergeant Jaquez explained that on the evening of October 26, 2016, he was riding in an unmarked car with two other GRU officers, John Wright and Michael Ashley. All three wore tactical vests and badges identifying them as police. The GRU officers were out looking for illegal weapons, along with four other GRU officers riding in a separate vehicle. They were in "the Kenilworth area" in the Northeast quadrant of the District, which (in the prosecutor's words) Sergeant Jaquez "kind of gestured to" on a map but did not define by specific boundaries.[1] According to Sergeant Jaquez, his GRU unit was "often sent to patrol that area," and they had recovered "multiple weapons, handguns, and also narcotics." When asked by the prosecutor to "estimate . . . how many guns [were] recovered," from that area, Sergeant Jaquez responded that, in the preceding three years, his unit had recovered "over 10 guns. It could be more . . . but I feel

---

[1] The government displayed the map but did not move it into evidence as an exhibit at the suppression hearing. At trial, the government moved several maps into evidence: "an overview image" with a "red thing [showing] an approximate area of what we're talking about," a "zoomed-in image," and an "even more zoomed-in" image of the same area—but it is unclear if any of these maps was the one used by the government at the suppression hearing. By the time this case was argued on appeal, the government was unable to locate the maps admitted into evidence at trial.

comfortable at this time saying about 10." And when asked to compare "the number of guns that [were] recovered in that area compare[d] to other areas," Sergeant Jaquez testified that this was "one of the . . . higher amounts of guns that we've recovered compared to other parts of the city." Sergeant Jaquez did not say that the GRU had received any reports about guns or had recovered other guns in this area on the date of Mr. Mayo's arrest or in the days or weeks preceding.

The car in which Sergeant Jaquez was riding pulled into an alley off of Quarles Street NE, in between and parallel to Kenilworth Avenue and 45th Street NE. There, the GRU officers saw a group of at least five individuals "just hanging out." Still sitting in the car, Sergeant Jaquez focused on one individual, later identified as Mr. Mayo. According to Sergeant Jaquez, Mr. Mayo "immediately disengage[d] from the group" and moved "to engage with a []man in a wheelchair" near a dumpster in the alley. While facing this other person, Mr. Mayo's back was to the officers. Sergeant Jaquez could not see Mr. Mayo's hands and observed "just motions from his back." Sergeant Jaquez demonstrated this movement, which the prosecutor then characterized for the record: "[J]ust as [Sergeant Jaquez] was gesturing, [Mr. Mayo's] back was turned to [Sergeant Jaquez], and you could see shoulders kind of moving up and down as though the hands were kind of in the center of a waistband." Notwithstanding his vantage point behind Mr. Mayo,

Sergeant Jaquez asserted that Mr. Mayo was "making slight adjustments with his front waistband."

After "a few seconds," Mr. Mayo walked away from the man in the wheelchair and toward another person standing further away from the officers in a walkway area off the alley leading toward 45th Street (where Sergeant Jaquez knew the other car of GRU officers was located). Around that time, the three GRU officers exited their car. Officers Wright and Ashley walked directly toward Mr. Mayo, while Sergeant Jaquez split off to one side and also walked in Mr. Mayo's direction. As the three GRU officers approached Mr. Mayo, Officer Wright called out to him, "[h]ey, we just want to talk. We just want to talk to you. Do you have any guns?" When the GRU officers got closer, Mr. Mayo began to run from them. As he ran past Sergeant Jaquez, Sergeant Jaquez "tried to tackle him." Although Sergeant Jaquez "leaped . . . with the hope and the intent to just grab [Mr. Mayo] right there," when he "reached out" to Mr. Mayo, he only "managed to trip up one of [Mr. Mayo's] feet." (Sergeant Jaquez also described his action as a "d[i]ve to try to stop" Mr. Mayo, which explains why, when he "reached out," he touched Mr. Mayo's foot.) As a result of this dive-tackle-grab, Mr. Mayo "kind of fell," but "put his hand down" to catch his balance and then continued running away from Sergeant Jaquez and his two GRU colleagues who had joined the chase.

Sergeant Jaquez and Officer Ashley eventually discontinued pursuit of Mr. Mayo, but Officer Wright kept running after him. Within a short distance,[2] the GRU officers in the second car, who had been alerted to Mr. Mayo's flight on the radio, stopped him. Meanwhile, Officer Wright searched the purse of a woman Mr. Mayo had run past as he fled and recovered a loaded handgun. (At trial the government presented evidence that subsequent fingerprint examination and DNA analysis connected the handgun to Mr. Mayo.) Another GRU officer found ziplock bags containing marijuana in the bushes adjacent to Mr. Mayo's flight path. The GRU officers also searched Mr. Mayo's person and found smaller, unused bags that matched those found in the bushes, as well as several hundred dollars and a large ziplock bag of marijuana.

The defense called an eyewitness, Dwayne Lane, to testify at the suppression hearing. According to Mr. Lane, he and Mr. Mayo were part of a larger group just "hanging" and "talking" in the alley when the GRU officers "pulled up and stopped" to "harass[]" them. Mr. Lane knew there was at least one other car of GRU officers nearby because, referring to the GRU officers by their tactics but not by name, "when

---

[2] According to Sergeant Jaquez's testimony, Mr. Mayo appears to have run only just beyond the square block of Kenilworth Avenue, Quarles Street, 45th Street, and Douglas Street before he was stopped by the second car of GRU officers; measurements by a defense investigator indicated that the total distance of Mr. Mayo's flight was less than 700 feet.

they come through the neighborhood, they come like two or three ways." While still sitting in their car, the GRU officers asked Mr. Lane and his friends, "do [you] have any guns?" In response, Mr. Lane testified that he and his friends all spread out and answered "no," and everyone, including Mr. Mayo, "lift[ed] [their] jackets up [to] show[] [the GRU officers] that [they] didn't have any guns."[3] Mr. Lane explained that when these officers "come in the neighborhood, we already know what they [are] coming for"—"we . . . kn[o]w what they want us to do"—"so we automatically just show our waistband, like we don't have anything." Mr. Lane testified that the group's actions did not satisfy the GRU officers; "they still got out [of] the car" and walked toward him, Mr. Mayo, and their companions, at which point everyone in the group "just scattered," with "everybody" running away from the officers. Mr. Lane explained that the fact that the police continued to approach "worried" him and the others in the group: "We all were just like[,] 'we are going to take off.'" Mr. Lane was trying to "get[] away from" the GRU officers, but he was not their

---

[3] Mr. Lane's testimony that the group lifted their jackets was uncontested. Sergeant Jaquez did not testify about what the three GRU officers had or had not said before they got out of their car. And the government did not seek to challenge Mr. Lane's testimony about the GRU officers' interaction with the group at this point in time, either on cross-examination of Mr. Lane or in its argument to the court in support of denying Mr. Mayo's motion to suppress. Although we understand our precedent would permit us to, *see infra* Part I.B, we opt not to rely on this testimony in our analysis.

target. After he started running, he turned to look back and saw that they had focused on and were chasing Mr. Mayo.

## B.     Trial Court's Rulings

The trial court initially granted Mr. Mayo's suppression motion from the bench. The court found that "there [wa]s no evidence at all" that the GRU officers had stopped in the alley because "there was any issue with guns"; "[t]hey were not called about anybody with a gun or any shooting. They were just [o]n their usual patrol . . . hunting for illegal guns." The court further found that when the police first saw the group that included Mr. Mayo, "they did not say there was any criminal activity afoot. They didn't see anything." The court acknowledged that Sergeant Jaquez had testified that Mr. Mayo had "detached from the group when he saw the [GRU] arrive." But after explaining that "there [wa]s nothing to put any doubt on the testimony of Mr. Lane that all of those guys in that group understood what that [GRU] vehicle was and what [the GRU officers] were coming to do," the court stated it "tend[ed] to believe more" that all the individuals in the group had "started to disperse" when the GRU officers arrived in the alley, as Mr. Lane testified, rather than that Mr. Mayo alone had separated from the group, as Sergeant Jaquez testified.

The court found that after Mr. Mayo walked over to the man in the wheelchair, the police saw Mr. Mayo making movements "around his groin area."[4] The court acknowledged that these movements made Sergeant Jaquez suspect that Mr. Mayo had a gun.[5] But the court indicated that Sergeant Jaquez's suspicion lacked adequate foundation because the police "didn't see the front" of Mr. Mayo's body, "didn't see any bulge" in his clothing, and only saw the movement "from the back." Relatedly, regarding the locational crime evidence, the court observed that "although there was . . . talk [that this was] a crime infested area, there was no evidence of . . . drug or narcotics sales," and the evidence that the police had recovered ten guns in the area over three years was insufficient in the court's view.

Lastly, the court "accept[ed] as a fact that everybody knew why the police was there and that they are the gun recovery unit," but noted that even though "people started to disperse because they kn[ew] what [wa]s going on," "nobody" ran and, in particular, Mr. Mayo did not "just run as soon as he saw the police." Instead, "the

---

[4] Because there was no testimony that Mr. Mayo's hand movements were around his "groin area," we presume the trial court meant "groin area" to be synonymous with "waistband."

[5] Describing Sergeant Jaquez's testimony, the court stated that Mr. Mayo's movements "bring [] the officer suspicion that usually this is done by people that are carrying a gun in their waistbelt" and later noted that Mr. Mayo "had the movement that *they say* creates the suspicions of weapons."

running beg[a]n when Officer Jaquez goes over to Mr. Mayo . . . and says, hey, I want to talk to you, do you have a gun? That is when Mr. Mayo begins to run."

Based on these findings of fact, the court concluded both that the police did not have reasonable articulable suspicion to stop Mr. Mayo at the point when the police asked to speak with him and he ran and that Mr. Mayo did not have to talk to the police if he did not want to. Skipping over Sergeant Jaquez's dive-tackle-grab as a potential seizure, the court further determined that the government had failed to prove that the GRU officers in the other car had a lawful basis for their actions when they seized and searched Mr. Mayo because the government had presented no testimony from anyone who had been present who could say "how and why" these actions were taken. Based on these legal rulings, the court concluded that the evidence recovered from Mr. Mayo's person was "the fruit of an illegal stop and [an] illegal search" and, as to this evidence, granted his motion to suppress.

The government immediately asked the court to reconsider. Similarly overlooking Sergeant Jaquez's dive-tackle-grab, the government argued that under the Supreme Court's decision in *Wardlow*, 528 U.S. 119, Mr. Mayo's "unprovoked flight" in a "[h]igh crime area," as well as his "messing with [his] waistband," gave the GRU officers in the second car ample basis to conduct a *Terry* stop. The court declined to alter its ruling based on the government's oral motion for

reconsideration. Specifically responding to the government's characterization of the location as a high-crime area, the court "invite[d] the government to point to where there is any evidence that quote/unquote this is a high crime area," reiterating it "was not satisfied that that came out in the evidence as being a high[-]crime area simply because they recovered 10 guns over three years and not in just that area, but in that neighborhood."

The government subsequently moved for reconsideration in writing, arguing that the police had not seized Mr. Mayo until his successful capture, by which point they had reasonable articulable suspicion to justify his seizure. In his opposition, Mr. Mayo argued that he had been seized as soon as he tried to leave the alley, when Sergeant Jaquez dove to tackle him and grabbed one of Mr. Mayo's feet. The trial court sided with the government as to the timing of Mr. Mayo's seizure and, reversing its initial ruling, concluded that the GRU possessed the requisite reasonable articulable suspicion to stop Mr. Mayo.

In making its final ruling denying Mr. Mayo's motion to suppress, the trial court relied on (1) Sergeant Jaquez's initial observation of Mr. Mayo's body "movement[s]" before the GRU officers approached him, although it continued to acknowledge that "he d[id not] see what[ was] going on in front of [Mr. Mayo's] body"; he only saw "movement of the body"; (2) Mr. Mayo's flight from the GRU

officers; (3) the GRU officers' discovery of drugs and a gun in the area of the chase; and (4) the evidence about guns recovered in the area. Regarding this final consideration, the court acknowledged that it continued to experience "difficulty[,] . . . in terms of the evidence that came[] in," with labeling the area "high[]crime." But the court determined the salient point was that "in the mind of the officer[,] we're dealing with an experience that the officer had in that area" and "[s]o a certain alertness on his part has to be understood." The court rejected defense counsel's argument that the government's evidence did not permit an assessment of whether the GRU officers' "wariness was reasonable because we don't know the details of what would have made them wary," e.g., how, where, or when prior guns had been recovered. Instead, the court concluded that Sergeant Jaquez's "wariness" was sufficiently supported because "he [had] recovered 10 guns in that area" and "[w]e know what area it is because the evidence shows pictures of the area and the neighborhood and the name of the neighborhood. So it's not the entire District of Columbia but it's that particular neighborhood."

After a trial, a jury found Mr. Mayo guilty of an array of drug and gun offenses.

## II.    Analysis

In the past, divisions of this court, like the government in its brief, have described our review of a ruling denying a motion to suppress as "limited," *see, e.g.*, *Jones v. United States*, 972 A.2d 821, 824 (D.C. 2009), or "narrow in scope," or suggested that we will affirm a suppression ruling so long as "the trial court had a substantial basis for concluding that no constitutional violation occurred," *see, e.g.*, *Jenkins v. United States*, 152 A.3d 585, 589 (D.C. 2017) (internal quotation marks omitted).  We now retire these unhelpful and potentially confusing descriptors.  Our review of legal issues raised by a suppression motion is and has always been de novo.  *See United States v. Lewis*, 147 A.3d 236, 239 (D.C. 2016) (en banc); *Hooks v. United States*, 208 A.3d 741, 745 (D.C. 2019) (citing *Lewis* among other cases to show this standard of review is unquestioned and long-established).  In conducting our analysis, we generally defer to the trial court's findings of fact "unless they are clearly erroneous." *Hooks*, 208 A.3d at 745.

Although we are generally bound by the trial court's express findings of fact and determinations of credibility (which, unusually in this case, were largely made in the context of the court's initial ruling granting Mr. Mayo's motion to suppress), we have not considered ourselves to be limited to them.  Instead, we have examined other record evidence presented at a suppression hearing to determine whether the

government proved that a defendant's constitutional rights were not violated. *Germany v. United States*, 984 A.2d 1217, 1221 (D.C. 2009) (explaining that, in evaluating whether a "motion to suppress was properly denied, we may of course consider all of the evidence at the suppression hearing" (quoting *Lewis v. United States*, 594 A.2d 542, 543 n.3 (D.C. 1991))); *see, e.g.*, *T.W. v. United States*, 292 A.3d 790, 803 (D.C. 2023) ("not[ing] that our conclusion that T.W. was seized is heavily influenced by the body-worn camera footage" introduced at the suppression hearing, which "captures just how jarring the officers' approach was in this case"); *Bingman v. United States*, 267 A.3d 1084, 1087, 1089-90 (D.C. 2022) (after concluding the trial court's findings did not provide a basis to uphold a *Terry* "patdown" of the defendant for weapons, confirming that other evidence in the record at the time of the suppression hearing did not justify the actions of the police).

We have viewed these record facts in the light most favorable either to the prevailing party, *Lewis*, 147 A.3d at 239, or to the court's ruling,[6] *see, e.g.*, *Bingman*, 267 A.3d at 1087. But neither approach compels us to ignore—or treat as refuted—undisputed facts from the suppression hearing that support a defendant's claim that their Fourth Amendment rights were violated and that evidence must be suppressed.

---

[6] Both constructions present challenges in this case where the trial court did not rule on the principal question before us—the constitutionality of Mr. Mayo's dive-tackle-grab seizure by Sergeant Jaquez—because the trial court did not recognize it as a seizure. *See supra* Part I.B.

As we explained in *Germany*, our court is "not limited to considering the facts the [trial] court found at the conclusion of the suppression hearing" and may instead "tak[e] into account [the defendant's] undisputed testimony at the suppression hearing in determining whether [the] trial court erred in denying [the] motion to suppress." 984 A.2d at 1221 (internal quotation marks omitted); *see also Masiello v. United States*, 304 F.2d 399, 400-01 (D.C. Cir. 1962) (holding that the trial court erred in ruling that the entry and search of defendant's home was lawful where defendant's suppression hearing testimony about the circumstances of the officers' entry was "uncontradicted" and "not inherently implausible"); *see generally Ward v. United States*, 365 A.2d 378, 381 n.3 (D.C. 1976) (explaining that our ultimate object is to determine whether there is "any reasonable view of the evidence" to support the ruling denying suppression).

The Public Defender Service ("PDS"), as amicus, challenges our examination of the full record when reviewing suppression rulings. Explaining that it was "borrowed from the sufficiency of the evidence context [and] date[s] from an era when no factual findings were required and courts issued general suppression rulings," PDS asserts that our court should cease our "light-most-favorable" interpretation of the record facts and limit ourselves to the specific findings of "essential" facts that Superior Court Rule of Criminal Procedure 12(d) as revised in 2016 requires trial courts to make. Super. Ct. Crim. R. 12(d) (2016) ("When factual

issues are involved in deciding a motion, the court must state its essential findings on the record."); *cf. United States v. Bailey*, 622 F.3d 1, 5 n.1 (D.C. Cir. 2010) (explaining that the D.C. Circuit only views the evidence in the light most favorable to the District Court's suppression ruling when that court has failed to make the requisite factual findings under Fed. R. Crim. P. 12([d])). The dissent appears to support this view. *See Post* at 71-72. We decline to address this argument, which was first raised in PDS's reply brief, and assume for the purposes of this case that to the extent we are able to look beyond the trial court's findings, we should view the facts of this case in the light most favorable to the trial court's ultimate suppression ruling (acknowledging, however, that some undisputed facts may simply be unfavorable, *see supra*).

In evaluating the trial court's ruling, we confront three questions: (1) when was Mr. Mayo seized; (2) whether, at the time of his seizure, the GRU officers had reasonable articulable suspicion under *Terry* to justify stopping Mr. Mayo; and (3) whether the fruits of his seizure must be suppressed. The now-vacated division decision determined that Mr. Mayo had been seized when Sergeant Jaquez dove to tackle him and grabbed his foot; at that point the GRU lacked the requisite reasonable articulable suspicion to stop Mr. Mayo; and suppression was required. *Mayo*, 266 A.3d at 255-56, 268, 272. The government asked this court to grant en banc review only as to the second issue—the question of reasonable articulable

suspicion. Because the question whether officers had reasonable articulable suspicion to seize Mr. Mayo depends on the existence of a seizure and a determination of when the seizure occurred, we address and reaffirm the division's determination that Mr. Mayo was seized at the time of the dive-tackle-grab. We then review, pursuant to the government's request, whether the GRU officers had reasonable articulable suspicion at this time and conclude that it did not. Lastly, we reinstate the division's analysis that the gun and drugs recovered subsequent to Mr. Mayo's illegal seizure must be suppressed.

### A.      Whether Sergeant Jaquez Seized Mr. Mayo

A division of this court previously rejected the "argument that an unsuccessful attempt by a police officer to detain an individual [by application of physical force] constitutes a seizure" in *Henson v. United States*, 55 A.3d 859, 862, 865-66 (D.C. 2012). We acknowledged statements in the Supreme Court's decision in *California v. Hodari D.*, 499 U.S. 621 (1991), indicating that a defendant need not yield to an application of force to be seized. *Henson*, 55 A.3d at 864 & n.6 (quoting *Hodari D.*, 499 U.S. at 624 ("To constitute an arrest, however—the quintessential 'seizure of the person' under our Fourth Amendment jurisprudence—the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee, was sufficient.")); *Hodari D.*, 499 U.S. at 626 ("The word

'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful."). We concluded, however, that this language (1) pertained to "the historical, common law definition of seizure," not a seizure for Fourth Amendment purposes, and (2) was dicta, in any event, because *Hodari D.* only concerned a failure to yield to an officer's show of authority. *Henson*, 55 A.3d at 864-66. Accordingly, we held in *Henson* "that an individual is seized within the meaning of the Fourth Amendment only when he or she is within the officer's control or yields to the officer's show of authority or application of force." *Id*. at 870.

In the proceedings before the division, the government initially relied on *Henson* to argue that Mr. Mayo was not seized by Sergeant Jaquez. But after the parties submitted their briefs to the division, the Supreme Court granted certiorari in *Torres v. Madrid*, 140 S. Ct. 680 (2019). The question presented in *Torres* was whether "an unsuccessful attempt to detain a suspect by use of physical force [is] a 'seizure' within the meaning of the Fourth Amendment . . . or [whether] physical force [must] be successful in detaining a suspect to constitute a 'seizure.'" Petition for Writ of Certiorari at I, *Torres v. Madrid* (No. 19-292), 2019 WL 4203519. Because this case and *Torres* "raise[d] the same Fourth Amendment seizure issue," the government moved to hold this appeal in abeyance pending a decision in *Torres*. We granted the government's motion.

In its decision in *Torres*, the Supreme Court effectively overruled *Henson*'s holding regarding what constitutes a seizure. Relying on *Hodari D.*, the Court rejected the distinction drawn in *Henson* between common law arrests and seizures for the purposes of the Fourth Amendment, and squarely decided that because "the common law considered the application of force to the body of a person with intent to restrain to be an arrest, no matter whether the arrestee escaped," the same was true under the Fourth Amendment. *Torres*, 592 U.S. at 311-12. Furthermore, the Court explained that because under the common law a "mere[ ]touch" was "sufficient to constitute an arrest," so too under the Fourth Amendment the "slightest" contact could suffice. *Id*. at 313-14. But the Court stressed that the use of force must be accompanied by the "*objectively* manifest[ed] . . . intent to restrain," and that "[a]ccidental force will not qualify" as a Fourth Amendment seizure. *Id*. at 317. In short, the Court held "that the application of [any] physical force to the body of a person with intent to restrain is a seizure [within the meaning of the Fourth Amendment] even if the person does not submit and is not subdued." *Id*. at 325.

In supplemental briefing requested by this court after the Supreme Court issued its decision in *Torres*, the parties agreed that Sergeant Jaquez's dive-tackle-grab constituted a seizure. We now hold the same "based on our independent review of the merits after a thorough examination of the record." *Rose v. United States*, 629

A.2d 526, 533 (D.C. 1993) (internal quotation marks omitted). We briefly set forth our reasoning.

Under *Torres*, Sergeant Jaquez's contact with Mr. Mayo, causing Mr. Mayo to trip and "kind of" fall, plainly amounted to an application of force to Mr. Mayo's body. And this application of physical force objectively manifested an intent to restrain. *See Torres*, 592 U.S. at 318 (concluding that an officer used physical force and "objectively manifested an intent to restrain" the defendant by ordering her to stop and then shooting at her). Even considered in the light most favorable to the government, the record evidence provides no support for an argument that Sergeant Jaquez's contact with Mr. Mayo was accidental. Rather, the only reasonable understanding of Sergeant Jaquez's purpose in dive-tackling Mr. Mayo and grabbing his foot is that Sergeant Jaquez was attempting to restrain Mr. Mayo to prevent him from running away, and Sergeant Jaquez conceded that was his aim.

**B.**     **Whether Sergeant Jaquez Had Reasonable Articulable Suspicion to Seize Mr. Mayo**

"[A] police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries." *Robinson v. United States*, 76 A.3d 329, 335 (D.C. 2013) (quoting the companion case to *Terry*, *Sibron v. New York*, 392 U.S. 40, 64 (1968)); *see also Brown v. United States*, 590 A.2d 1008, 1013

(D.C. 1991) (whether in their homes or out in public, individuals in the District have a Fourth Amendment right generally "to be left alone" by the police) (internal quotation marks omitted). Under the Fourth Amendment, the police must have either probable cause to arrest an individual for a crime or at least reasonable articulable suspicion that an individual is engaged in criminal conduct to effect the "lesser intrusion" of a "brief[]" *Terry* "stop" to investigate whether that is in fact the case. *Brown*, 590 A.2d at 1013. Thus, "[e]ven a brief restraining stop of a person [by the police] is an unreasonable seizure in violation of the Fourth Amendment if it is conducted for investigatory purposes without a reasonable suspicion supported by specific and articulable facts that the individual is involved in criminal activity." *Golden v. United States*, 248 A.3d 925, 933 (D.C. 2021) (internal quotation marks omitted).

*Terry*'s reasonable articulable suspicion standard "requires . . . considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (internal quotation marks omitted). It "is not onerous, but it is not toothless either." *Robinson*, 76 A.3d at 336 (citation and internal quotation marks omitted). "An officer's 'inchoate and unparticularized suspicion or hunch of criminal activity'" will not suffice. *Pleasant-Bey v. United States*, 988 A.2d 496, 500 (D.C. 2010) (quoting *Wardlow*, 528 U.S. at 123-24). Nor will a "subjective good faith"

belief in the propriety of a stop. *Pridgen v. United States*, 134 A.3d 297, 301 (D.C. 2016).

Reasonable articulable suspicion is a legal term of art, but, as the Supreme Court has acknowledged, "[a]rticulating precisely what [it] . . . mean[s] is not possible." *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (internal quotation marks omitted). The Court has described it as a "commonsense, nontechnical conception[] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Id*. (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)); *see also Washington v. State*, 287 A.3d 301, 317 (Md. 2022) (explaining "[t]he meaning of reasonable suspicion is not fixed," and "relies on a commonsense understanding of the factual and practical aspects of daily life and how reasonable and prudent people act") (internal quotation marks omitted). Assessing whether law enforcement officers had the requisite reasonable articulable suspicion to justify a *Terry* stop, however, also requires some balancing by judges of the "weighty social objective," *Brown v. Texas*, 443 U.S. 47, 52 (1979), of "effective crime prevention and detection" against the Fourth Amendment's protection of the "sanctity of the individual," *Terry*, 392 U.S. at 22, 26.

To determine if a *Terry* stop was supported by reasonable articulable suspicion, a court must examine whether the totality of "the facts available to the officer at the moment of the seizure . . . 'warrant a [person] of reasonable caution in the belief' that [the stop] was appropriate." *Terry*, 392 U.S. at 21-22; *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) (acknowledging that "officers [may] draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them"). The facts contributing to reasonable articulable suspicion must be specific and provide a "particularized and objective basis" to suspect that "the particular individual being stopped is engaged in wrongdoing." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981) (explaining that "[t]his demand for specificity in the information upon which police action is predicated is the central teaching of [the Supreme] Court's Fourth Amendment jurisprudence" (quoting *Terry*, 392 U.S. at 21 n.18)). "Multiple factors may contribute to the totality of the circumstances"; these "includ[e] the time of day, flight, the . . . nature of the location, furtive hand movements, an informant's tip, a person's reaction to questioning, a report of criminal activity or gunshots, and viewing of an object or bulge indicating a weapon." *Posey v. United States*, 201 A.3d 1198, 1201-02 (D.C. 2019) (internal quotation marks omitted). In short, "the mosaic which is analyzed for a reasonable-suspicion . . . inquiry is multi-faceted," *Ornelas*, 517 U.S. at 698, and the "fluid concept[]" of reasonable suspicion "take[s]

[its] substantive content from the particular contexts in which [it is] being assessed." *Id*. at 696.

Through our scrutiny of the particular factual mosaic of a case, our court ensures that the "narrow" scope of the exception created by *Terry* to the Fourth Amendment requirement that an arrest be supported by probable cause is not unduly expanded. *Robinson*, 76 A.3d at 335 (quoting *Ybarra v. Illinois*, 444 U.S. 85, 93 (1979)); *cf. Ornelas*, 517 U.S. at 699 (explaining that courts should carefully scrutinize warrantless searches as "[t]he Fourth Amendment demonstrates a strong preference for searches conducted pursuant to a warrant . . . and the police are more likely to use the warrant process if the scrutiny applied to a . . . probable-cause determination to issue a warrant is less than that for warrantless searches" (internal quotation marks omitted)).

To give reasoned consideration to all the factors alleged to contribute to reasonable articulable suspicion, we do not consider them as a jumble. Instead, as part of our totality of the circumstances analysis, we first assess the legitimacy and weight of each of the factors that possibly contribute to that totality; we then weigh that information all together. *In re D.A.D.*, 763 A.2d 1152, 1155 (D.C. 2000) (explaining that to assess whether the police had reasonable articulable suspicion, "we evaluate each factor individually and then as a whole"); *see also United States*

*v. Bowman*, 884 F.3d 200, 214 (4th Cir. 2018) ("[I]n considering whether the factors articulated by a police officer amount to reasonable suspicion, this court 'will separately address each of these factors before evaluating them together with the other circumstances.'" (quoting *United States v. Powell*, 666 F.3d 180, 187-88 (4th Cir. 2011))).

Here, we consider whether there was reasonable suspicion to justify a seizure based on the circumstances known to the police before Sergeant Jaquez dove to tackle Mr. Mayo. Specifically, we consider (1) the GRU officers' initial observations of Mr. Mayo's presence in a group in an alley, the dispersal of that group, and his subsequent interactions with two other individuals; (2) the officers' observation of his flight after they exited their vehicle, approached him, and asked him and only him if he had a gun; and (3) their previous seizures of guns in that area. Based on a consideration of the particular circumstances of this case, both individually, *infra* Part II.B.1-3, and collectively, *infra* Part II.B.4, we conclude Mr. Mayo's seizure was not supported by reasonable articulable suspicion and was thus unlawful.

### 1. The GRU Officers' Initial Observations of Mr. Mayo

This street encounter began when Sergeant Jaquez and his fellow GRU officers decided to pull their vehicle into an alley and approach a group of

individuals who, according to Sergeant Jaquez, were "just hanging out."  As the trial court found, the officers were not responding to any tip or report of a crime in the area and they did not see "any criminal activity afoot.  They didn't see anything"— they were simply "just [o]n their usual patrol . . . hunting for illegal guns."  *See Posey*, 201 A.3d at 1203 (in concluding police lacked justification to conduct *Terry* stop, assigning significance to their lack of observation of "any illegal activity or any indicia of illegal activity as the officers approached the group of men that included [the appellant]").

Thereafter, the GRU officers "singled out" Mr. Mayo, allegedly because he "disengaged" or walked away from one cluster of individuals and toward other individuals nearby.  But the trial court credited testimony from Mr. Lane, another member of the group in the alley, that, in fact, the entire group dispersed as the police arrived.  As the trial court found, they "kn[ew]" the GRU, they understood what the GRU were there for, and they were seeking to stave off further interaction.  The trial court explained that "there [wa]s nothing to put any doubt on the testimony of Mr. Lane that all of those guys in that group understood what that vehicle was and what they were coming to do" and thus it "tend[ed] to believe more" that all the individuals in the group had "started to disperse" when the GRU officers arrived, as Mr. Lane testified, rather than that Mr. Mayo alone had separated from the group, as Sergeant Jaquez testified.  Given the trial court's finding that the entire group

dispersed, as well as our previous recognition that "an individual's 'attempt to exercise his right not to participate in an encounter' with police officers does not 'constitute the kind of conduct on the scene that could significantly bolster the government's showing of articulable suspicion,'" *Bennett v. United States*, 26 A.3d 745, 753 (D.C. 2011) (ellipsis omitted) (quoting *Brown*, 590 A.2d at 1019-20), Mr. Mayo's actions in response to the GRU's arrival provided little support for the officers' decision to seize him, *see In re T.L.L.*, 729 A.2d 334, 340-42 (D.C. 1999) (holding appellant's seizure was unsupported by reasonable articulable suspicion where, in response to the arrival of police at the scene who were investigating a vague lookout, the appellant and the "entire group of young men"—"the innocent as well as the possibly guilty"—"tr[ied] to make themselves scarce" by running into an apartment).

The GRU officers also focused on what they perceived to be Mr. Mayo's hand movements while interacting with the man in the wheelchair, the first person he approached after he allegedly separated from the people he had been talking to when the police pulled into the alley. According to Sergeant Jaquez, Mr. Mayo was "making slight adjustments with his front waistband." Such movements might have provided some basis for suspecting Mr. Mayo had a weapon in that location had

Sergeant Jaquez in fact been able to see them.[7] But the evidence did not establish that Sergeant Jaquez saw Mr. Mayo's hands touch his waistband. At the time Sergeant Jaquez was observing Mr. Mayo, he and his fellow GRU officers were still in the police car and Mr. Mayo was standing some distance away with his back to them. As the prosecutor documented after Sergeant Jaquez's in-court demonstration of Mr. Mayo's movements, all Sergeant Jaquez could see were shoulder shrugs, which made it seem like Mr. Mayo's hands were moving somewhere in front of him near the waistband level. The trial court made a specific finding that Sergeant Jaquez "didn't see the front" of Mr. Mayo's body and only saw movement around Mr. Mayo's "groin area," (*but see supra* note 4) "from the back."[8]

---

[7] The government represents that the trial court inferred from these movements that Mr. Mayo was armed. But the transcript pages to which the government cites document that the court was simply acknowledging Sergeant Jaquez's speculative testimony regarding Mr. Mayo's hand movements. *See supra* note 5.

[8] In its brief to the en banc court, the government highlights trial testimony from Officer Wright, whom the government did not call to testify at the suppression hearing. According to Officer Wright, after the police drove into the alley and Mr. Mayo "disengage[d] from the group," he appeared to adjust something at his waistband before he approached the man in the wheelchair and then "appear[ed] to move his jacket up" as though he were "going to hand something to the []man in the wheelchair." Based on these observations, Officer Wright testified that he suspected Mr. Mayo had a gun.

We have previously recognized our ability to consider undisputed trial testimony in reviewing a ruling on a motion to suppress—though our decisions are inconsistent as to whether such undisputed testimony may only be used to uphold

Viewed in the context of this record, including the lack of any report of a gun sighting in the area and the weak locational crime evidence, *see infra* Part II.B.3, Mr. Mayo's gestures are "capable of too many innocent explanations" to provide much, if any, support for a reasonable articulable suspicion that Mr. Mayo was armed or otherwise engaged in criminal activity. *Duhart v. United States*, 589 A.2d 895, 899 (D.C. 1991) (internal quotation marks omitted). This court has repeatedly held that hand movements that have been directly observed and are consistent with mundane behavior do not necessarily contribute to reasonable articulable suspicion. For example, in *Duhart*, this court rejected the government's argument that an

the trial court's suppression ruling, *see, e.g.*, *West v. United States*, 604 A.2d 422, 427 (D.C. 1992), or whether it may also be used to support a conclusion that the court erred in denying suppression, *see, e.g.*, *Miles v. United States*, 181 A.3d 633, 643-44 & n.17 (D.C. 2018) (relying on undisputed trial testimony that the police drove up onto the sidewalk and blocked the defendant's path and explaining that these actions diminished the possibility that defendant's flight was a product of consciousness of guilt). Even assuming that only the more limited use of undisputed trial testimony is proper, *but see post* at 72 (questioning the "wisdom and fairness" of considering any trial testimony when reviewing a suppression ruling), we decline to give Officer Wright's testimony much, if any, weight. *See, e.g.*, *Armstrong v. United States*, 164 A.3d 102, 106 n.7 (D.C. 2017) (explaining that undisputed trial testimony "*may* be considered in determining whether error was committed in ruling on a pretrial motion to suppress" (emphasis added)). While not directly disputed, Officer Wright's testimony that he could see Mr. Mayo adjust something at his waistband and appear to move his jacket up conflicted with and was placed in considerable doubt by Sergeant Jaquez's testimony both at the suppression hearing and at trial that Mr. Mayo only made hand movements at his waistband level while his back was to the GRU officers (who were still all together in their vehicle), making it impossible to see either his hands or the front side of his body.

officer's observation of the appellant and another individual "examining 'something'" in an area "known for high narcotics activity" and the appellant's subsequent act of "shov[ing] an item into his pocket" after seeing the police officer furnished "particularized fact[s] from which [the officer] could conclude that what had transpired had some connection with drugs." *Id.* at 897-900; *see also id.* at 899 ("There is nothing 'unusual' or even mildly 'suspicious' about such activity, which must occur as a matter of course between individuals every day, and there are innumerable innocent explanations for such behavior."). Similarly, in *In re A.S.*, 827 A.2d 46 (D.C. 2003), this court concluded that the appellant's "stuffing motion with his right hand into [his] waistband area" could have been the innocuous act of "tucking in his shirt, scratching his side, pulling up his pants, arranging his underwear, pager, cell phone, or walkman, etc." and thus could not support reasonable articulable suspicion to justify a seizure. *Id.* at 47-48 (internal quotation marks omitted); *see also In re D.J.*, 532 A.2d 138, 142-43 (D.C. 1987) (*modified on other grounds by Allison v. United States*, 623 A.2d 590 (D.C. 1993)) (rejecting the government's argument that appellant's act of "putting his hands in his pockets" "raised sufficient cause for suspicion to justify a *Terry* stop"); *cf. Morgan v. United States*, 121 A.3d 1235, 1237-38 (D.C. 2015) (holding police officers had reasonable articulable suspicion to conduct a *Terry* stop based on a report from a citizen who saw appellant "'reach[] into the back of his pants and pull[] something out and put

it back in' during the exchange of small objects with another man," because there was "no plausible, innocent explanation for such conduct" (brackets omitted)).[9] Because here, the GRU officers could not actually observe Mr. Mayo's hands, the innocuous possibilities multiply and the value of these movements in constructing reasonable articulable suspicion correspondingly diminishes.[10]

In short, the GRU officers' observations of Mr. Mayo's actions before he fled from them do not, on their own, provide much in the way of support for the government's argument that the officers had a lawful basis to stop him.

---

[9] The dissent argues that, in some circumstances, "hand movements that 'are consistent with mundane behavior' can contribute to reasonable, articulable suspicion" when combined with other evidence that makes those particular hand movements indicative of wrongdoing. *Post* at 79. We do not disagree. Our point is that innocuous hand movements do not contribute to reasonable articulable suspicion absent other factors that make that behavior more salient.

[10] In its brief, the government highlights Sergeant Jaquez's trial testimony—more pointed than the testimony he provided at the suppression hearing, *see supra* Part I.A—that he "believed" Mr. Mayo might have been trying to "pass [a gun] off" to someone else. Even if we were to consider this testimony, *but see supra* note 8, given Sergeant Jaquez's conceded limited ability to observe Mr. Mayo, who was "[f]acing away from [him and his fellow GRU officers]," *see supra id.*, his "belief" about what Mr. Mayo was doing is speculative and unhelpful to our analysis. *See Parsons v. United States*, 15 A.3d 276, 280 (D.C. 2011) ("A court may not simply rely on a police officer's conclusory assertions in deciding whether a search or seizure was justified under the Fourth Amendment, but rather must evaluate the facts underlying those assertions." (internal quotation marks omitted)).

## 2.      Mr. Mayo's Flight from the GRU Officers

After Mr. Mayo spoke to the man in the wheelchair, he moved further away from the GRU officers to speak to another individual.  At that point, the GRU officers exited their vehicle, approached Mr. Mayo, and called out to him, asking if he had a gun.  Mr. Mayo then ran.  We consider the import of Mr. Mayo's flight at this point in his encounter with the GRU.

"[A] defendant's flight [from the police] can be a relevant factor in the reasonable suspicion analysis." *Miles v. United States*, 181 A.3d 633, 641 (D.C. 2018).  As the Supreme Court observed in *Wardlow*, "[h]eadlong flight . . . is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."  528 U.S. at 124; *see also District of Columbia v. Wesby*, 583 U.S. 48, 59 (2018) (observing that "deliberately furtive actions and flight at the approach of law officers are *strong* indicia of *mens rea*" which "can be treated as 'suspicious behavior' that factors into the totality of the circumstances" (ellipses and internal quotation marks omitted)); *Glover*, 589 U.S. at 383 (acknowledging *Wardlow*'s determination that "[h]eadlong flight . . . could factor into a police officer's reasonable suspicion determination" (internal quotation marks omitted)).  That said, as we have previously explained and once more reaffirm, "flight cannot imply consciousness of guilt in all cases." *Miles*, 181 A.3d at 641 (quoting

589 A.2d at 900 (quoting *Smith v. United States*, 558 A.2d 312, 316 (D.C. 1989) (en banc))). "Flight is not merely a box that, once checked, automatically justifies a stop." *Posey*, 201 A.3d at 1204.

An assessment of *reasonable* articulable suspicion always requires consideration of the totality of the circumstances and the particularity of the evidence as to the defendant. *Miles*, 181 A.3d at 637-38; *Cortez*, 449 U.S. at 417-18. A defendant's flight, just "like any [other] factor in our comprehensive analysis . . . is viewed in the context of the specific facts and corroborating circumstances of each individual case."[11] *Posey*, 201 A.3d at 1204; *see also Washington*, 287 A.3d at 334 (endorsing a totality of the circumstances analysis and observing that "[j]ust as a bulge in a person's clothing has different implications for a reasonable suspicion analysis depending on where it is, what it looks like, or the circumstances surrounding its observation[,] . . . the nature and circumstances surrounding flight from police make a difference" (internal quotation marks omitted)); *cf. Glover*, 589

---

[11] Indicating that it disagrees with the majority opinion, the dissent notes that (1) "*Terry* stops can permissibly be based on police observations of actions that might have an innocent explanation, as long as those actions, considered as a whole, are sufficiently suspicious" and thus (2) "the mere fact that flight from the police might in some circumstances be lawful and innocent does not preclude [its] consideration as part of the totality of circumstances bearing on whether a *Terry* stop was permissible." *Post* at 80-81. If the dissent is arguing that flight must be assessed in context, then we agree. If the dissent is arguing that flight must always be perceived as inculpatory, but may be counterbalanced by other evidence, then we part ways with the dissent for the reasons set forth *infra*.

U.S. at 386 (explaining that under a totality of the circumstances analysis "the presence of additional facts might dispel reasonable suspicion").

"There are myriad reasons an innocent person might run away from the police." *Miles*, 181 A.3d at 641. "[A]n individual may be motivated to avoid the police by a natural fear or dislike of authority, a distaste for police officers based upon past experience, a[] . . . fear of police brutality or harassment, a fear of being apprehended as the guilty party, or other legitimate personal reasons." *Id.* (internal quotation marks and brackets omitted). If, hypothetically, the chief of a city's police department announced, as part of an initiative to get guns off the streets of the District, that her officers were going to stop and frisk every young male in a particular part of the city under the age of twenty-five without any regard for the legality of those searches or the ability to later win criminal convictions, it would be *unreasonable* to mechanically view flight from the police by individuals in that demographic group as necessarily indicative of consciousness of guilt. Rather, without any other contextual information, the much stronger inference would be that these individuals were seeking to avoid having their liberty suspended and their dignity compromised. *See Terry*, 392 U.S. at 16-17 (recognizing that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person"; the "careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is . . . a 'search'"; and

"such a procedure performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised . . . is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment").

In short, flight, even from the police, does not automatically justify a *Terry* stop, and the degree to which flight reasonably gives rise to an inference of consciousness of guilt and thereby contributes to reasonable articulable suspicion depends on context. *Duhart*, 589 A.2d at 900 (explaining that "the circumstances of the suspect's efforts to avoid the police must be such as permit[] a rational conclusion that flight indicated a consciousness of guilt" (internal quotation marks omitted)); *see also, e.g.*, *Miles*, 181 A.3d at 644 (considering whether the "character" of appellant's flight was "incriminating" to assess whether police had the requisite justification to conduct a *Terry* stop); *see generally Glover*, 589 U.S. at 385-86 (noting that "[t]his court's precedents have repeatedly affirmed that the ultimate touchstone of the Fourth Amendment is reasonableness" (internal quotation marks omitted)).

Our approach to evaluating flight is consistent with Supreme Court precedent. The Court first discussed flight as a justification for a *Terry* stop in *Wardlow*. *See* 528 U.S. at 124-25. Notably, the Court declined the State's request to adopt a

"bright-line rule" that seizure of anyone who flees "upon the sight of a clearly identifiable officer, as a matter of law, justifies" such a stop. Petitioner's Br. at 5, 10-11, 13, *Wardlow* (No. 98-1036), 1999 WL 451857; *see also Wardlow*, 528 U.S. at 127-28 (Stevens, J., concurring in part and dissenting in part) ("agree[ing] with the Court's rejection of the per se rule[]" the State proffered). Instead, the Court reaffirmed that "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior," and conducted a totality of the circumstances analysis to discern if police had "reasonable, particularized suspicion" that Mr. Wardlow was "committing a crime" considering the "relevant contextual considerations." *Wardlow*, 528 U.S. at 124-25. The Court took note of the fact that the officers in that case were part of a caravan "converging on an area known for heavy narcotics trafficking," and "expected to find a crowd of people in the area, including lookouts and customers," when they saw an individual in that area "standing next to" 4035 West Van Buren holding an opaque bag who "looked in the direction of the officers and fled."[12] *Id*. at 121-22, *see also id*. at 124-25.

---

[12] The dissent highlights this court's observation in *Wilson v. United States* that Mr. Wardlow's possession of an opaque bag "played no part in the [Supreme] Court's reasoning" in *Wardlow*. 802 A.2d 367, 371 (D.C. 2002); *post* at 105. But *Wilson*'s view that *Wardlow* injected extraneous facts into its opinion even as it embraced a totality of the circumstances analysis is subject to doubt. And in

In subsequent decisions, the Court has made clear that *Wardlow* did not articulate a rigid rule that all flight, regardless of context, supports a reasonable articulable suspicion calculus. In *Missouri v. McNeely*, 569 U.S. 141 (2013) (plurality opinion), the Court cited *Wardlow* as an example of a "fact-intensive, totality of the circumstances analys[is]" and not one performed "according to categorical rules." *Id.* at 158. And as noted above, in *Glover*, the Court explained that flight "*could* factor into a police officer's reasonable suspicion determination," 589 U.S. at 383 (emphasis added), even as it reaffirmed that the reasonable articulable suspicion standard "takes into account the totality of the circumstances— the whole picture," *id.* at 386. Likewise, in *Wesby*, after noting that flight "*can* be treated as 'suspicious behavior' that factors into the totality of the circumstances," 583 U.S. at 59 (emphasis added), the Court explained why, in the context of that case, the individuals' flight from officers was suspicious: having observed a late-night party in an abandoned, filthy house where among other things, "the living room had been converted into a makeshift strip club," "[a] reasonable officer could infer

---

decisions since *Wilson* our court has expressed an understanding, shared by other courts, that the opaque bag was part of the totality of the circumstances the Court considered in *Wardlow*. *See Gordon v. United States*, 120 A.3d 73, 84 (D.C. 2015); *Miles*, 181 A.3d at 640-41; *Henson*, 55 A.3d at 871 (Blackburne-Rigsby, C.J., concurring); *see also, e.g.*, *United States v. Navedo*, 694 F.3d 463, 471 (3d Cir. 2012); *United States v. Brown*, 925 F.3d 1150, 1155-56 (9th Cir. 2019). Even if we disregard the opaque bag referenced in *Wardlow*, however, our analysis of that case and the guidance it provides us here would not change.

that [the individuals'] scattering and hiding was an indication that they knew they were not supposed to be there." *Id.* at 58-59.

We acknowledge that prior decisions of this court have interpreted flight as inculpatory without examining whether an individual defendant's flight evinced consciousness of guilt under the particular circumstances of the case. In *Wilson v. United States*, 802 A.2d 367 (D.C. 2002), we indicated that we understood *Wardlow* to hold that all "unprovoked flight" weighs in favor of reasonable articulable suspicion. *Id.* at 370-71. And in *Henson*, already partially overruled, *see supra* Part II.A, we indicated that all flight from known police officers is inculpatory, save that which is responsive to the use of excessive force by those officers. 55 A.3d at 868-70. These categorical views are irreconcilable with a central concern of the reasonable articulable suspicion inquiry—to discern whether a defendant's behavior reasonably indicates a guilty mind—and sub silentio, if not expressly, we have recognized that these cases are inconsistent with binding precedent. *See Miles*, 181 A.3d at 644 n.18 (discussing *Henson* and explaining that "it would be a mistake to focus entirely on the propriety of the police officers' conduct" when evaluating flight, "given that the key question is whether the defendant's flight is probative of his or her participation in criminal activity," not whether a defendant reasonably believes they had a right to act in self-defense by fleeing from excessive force).

Turning to this case, we consider to what degree Mr. Mayo's flight, considered in context, could have been reasonably interpreted by the officers as consciousness of guilt. To begin with, we note that this case is nothing like *Wardlow*, where the defendant, who was holding an opaque bag (*see supra* note 12) and standing at an address in an area of high narcotics activity on which officers were "converging," took one look at police officers and ran. *See* 528 U.S. at 121-22, 124-25. Nor is it akin to *Wesby*, where the police heard loud music and smelled marijuana coming from an abandoned, filthy house where it appeared a strip-club party was being held and many of the occupants "scattered at the sight of the uniformed officers." 583 U.S. at 59. Here, the GRU officers had no reason to believe they would find any criminal activity in the alley and observed none. And the court credited Mr. Lane's testimony that although people dispersed when the police first drove up, "nobody" ran at that point.

Furthermore, Mr. Mayo took flight only after the GRU officers took a series of actions that they should have reasonably understood to communicate to a person in Mr. Mayo's position that they planned to stop him. After observing Mr. Mayo and his companions from their police cruiser, the GRU officers exited their vehicle wearing tactical gear and singled Mr. Mayo out from the already-dispersed group. They followed him as he walked down a pathway off the alley toward the location of another car of GRU officers, with two officers directly behind Mr. Mayo and

another taking a parallel path. And they called out as they closed in on him, "[h]ey, we just want to talk. We just want to talk to you. Do you have any guns?" As the trial court found, only then did Mr. Mayo decide to run.

The GRU officers' appearance and actions make this case much like *Miles*, where we concluded that "there was nothing about the character of Mr. Miles's flight that seemed particularly incriminating" under the circumstances. 181 A.3d at 644. In that case, the police followed Mr. Miles on foot from behind and cut off his path with a police car from the front, before asking (effectively ordering) him to stop. *Miles*, 181 A.3d at 636, 643-44. We explained that, regardless of their legality or propriety, the officers' actions "would be startling and possibly frightening to many reasonable people," demonstrating "a reason other than consciousness of guilt for [appellant] to have fled." *Id.* at 644 & n.18; *see also Dozier v. United States*, 220 A.3d 933, 942 (D.C. 2019) (identifying the manner in which the armed police officers positioned themselves as they engaged with the appellant in an alley, including by "park[ing] the patrol car at the entrance to the alley" and "walking closer to appellant as they called out to him," as one factor that made the police encounter with appellant "particularly intimidating"). We acknowledge that, unlike in *Miles*, the GRU officers did not, in so many words, direct Mr. Mayo to stop. But we do not think this single fact mitigates the coercive nature of the GRU officers' approach because they had already communicated to Mr. Mayo by their actions that

they did not intend to allow him to leave without engaging with them. *See T.W. v. United States*, 292 A.3d 790, 796 (D.C. 2023) ("The officers' approach signaled that they suspected T.W. of criminal activity . . . and that they would detain him unless disabused of their suspicions.").

Moreover, we must consider what the officers did say. Focusing on Mr. Mayo specifically, they asked if *he* had a gun. We examined similar conduct in *Golden*: the GRU officers targeted a young man on the street and asked, in a "conversational" tone, if "he had any weapons on him."[13] 248 A.3d at 932. We explained that "[i]t would be a mistake to view the [GRU officers' 'do you have a gun'] inquiry as equivalent to a simple request for information that an officer might put to an ordinary civilian who is not a suspect but merely may be helpful in an investigation." *Id.* at 937. Because it is illegal to carry a gun in the District without proper licensure and registration, D.C. Code §§ 22-4504(a); 7-2502.01(a), we elaborated:

> With this question, the officer gave [the appellant] reason to understand that a group of police officers in unmarked cars had singled him out and partially surrounded him because they suspected *him* of being armed and committing a crime at that very moment. [The appellant] (and any reasonable innocent person in his position) could not know what grounds the police had to suspect this, what

---

[13] *Golden* is not factually on all fours with this case. But the distinctions in precisely how the defendant was approached by the GRU are immaterial for the purpose of our analysis of the coercive nature of the question, "do you have a gun?"

else the police suspected about him, or how dangerous the
police officers deemed him to be.

*Id.*; *accord Dozier*, 220 A.3d at 938, 941 (explaining that, where police in tactical gear single out one person and ask "hey, man, can I talk to you?" and then ask if the person is armed, it would be reasonable for the targeted individual "to feel vulnerable and apprehensive" because such "questioning is at least implicitly accusatory (if not explicitly so)" (internal quotation marks omitted)).[14]  As the court asked in *Golden*, "[w]ho among us would not have been uneasy if a squad of police suddenly appeared, partially surrounded us on the street at night, and began interrogating us as a criminal suspect?"  248 A.3d at 945-46.  Given that accusatory questioning, "particularly in conjunction with other intimidating or coercive circumstances," could convey a message to a reasonable person that they were not free to leave, *id.* at 935-36; *see also T.W.*, 292 A.3d at 796-97, 803, it is no logical leap to conclude that the same police conduct could also prompt a reasonable, innocent person who fears unjustified arrest to flee.  Indeed, such a "flashbang method of approaching and questioning a subject" after "jump[ing] out of halting vehicles" "seems designed to produce" such fear, which could lead either to "temporary paralysis or flight."  *T.W.*,

_____

[14] In *Dozier*, we observed that a reasonable person might submit to this show of authority out of fear that an attempt to "ignor[e] [the] police presence[] or refus[e] to answer police questions . . . might lead to detention and, possibly, more aggressive police action."  220 A.3d at 944.  This fear came true in Mr. Mayo's case: Sergeant Jaquez responded to Mr. Mayo's attempt not to engage with the police by dive-tackling him.

292 A.3d at 803; *cf. State v. Nicholson*, 188 S.W.3d 649, 660-62 (Tenn. 2006) (recognizing that "innocent reasons for flight" may "includ[e] . . . fear of being wrongfully apprehended as a guilty party," rejecting the government's argument that defendant's seizure was justified under *Wardlow*, and holding under the Tennessee Constitution that officers lacked reasonable articulable suspicion where defendant fled from an officer after being asked to "hold up" near "an area being investigated for gang activity").[15]

---

[15] The government points to a handful of decisions from outside this jurisdiction to argue that "[n]umerous other courts have inferred consciousness of guilt when defendants fled from police in circumstances equally or more adversarial than those presented here." The dissent makes a similar argument. We are unpersuaded.

Many of the decisions cited by the government and the dissent either fail to apply a totality of the circumstances analysis and conclude defendants' flight contributed to reasonable suspicion simply because the defendants fled officers in a "high-crime area," *United States v. Wilson*, 963 F.3d 701, 704 (7th Cir. 2020) (concluding, without further analysis, that the officer had reasonable articulable suspicion because of defendant's "unprovoked, headlong flight from police in a high-crime area"); *United States v. Ward*, 482 F. App'x 771, 773 (4th Cir. 2012) (concluding, without more, that "officers possessed reasonable suspicion" because of factors, including the defendant's "presence in a high-crime area" and his "unprovoked flight")—or they conclude that flight in the absence of police misconduct is categorically inculpatory, *United States v. Jeter*, 721 F.3d 746, 754-55 (6th Cir. 2013) (concluding defendant's flight supported finding reasonable articulable suspicion in part because there was "no evidence that . . . officers used fraud to provoke [defendant's] flight" and because he admitted after his arrest that he "ran because [he] had a gun" (internal quotation marks omitted)); *State v. Law*, 112 So.3d 611, 613 (Fla. Dist. Ct. App. 2013) (per curiam) (concluding that defendant's flight weighed in favor of finding reasonable articulable suspicion

Lastly, accepting "the reality that not all encounters with the police proceed from the same footing, but are based on experiences and expectations," *Dozier*, 220 A.3d at 945, and that "uneven policing practices can affect innocent people's reaction to law enforcement," *Washington*, 287 A.3d at 331 (internal quotation marks omitted), any evaluation of a reasonable police officer's interpretation of Mr. Mayo's flight must take into account that some individuals in highly policed communities might fear over-aggressive police conduct and may flee as a result even if they are innocent of any wrongdoing. *See United States v. Brown*, 925 F.3d 1150,

---

because his flight was not provoked by "substantial evidence of an 'unreasonable show of force'" by the officers involved).

The remaining cases, although they appear to apply a true totality of the circumstances analysis, are not at all analogous to this case because they involve circumstances where the police had specific information linking a defendant (or someone who looked like the defendant) to a specific crime, which put the defendant's flight in a different light. *See United States v. Velez*, No. CR 15-00102, 2015 WL 3465738, at *3-4 (N.D. Cal. June 1, 2015) (concluding that officers had reasonable articulable suspicion where police located defendant in the vicinity shortly after a robbery had occurred, he largely matched the description of the suspect, and his flight from police was combined with other suspicious behaviors, such as "hiding behind a utility box"); *United States v. Lawson*, 233 F. App'x 367, 368, 370 (5th Cir. 2007) (holding that officer had reasonable articulable suspicion where he was investigating a tip that an individual in a particular neighborhood named "G Dog" or "Jerome" was involved in several armed robberies, saw a man matching the suspect's description, and after he initiated contact, the defendant ran); *In re D.M.*, 781 A.2d 1161, 1162, 1164-65 (Pa. 2001) (holding that officer had reasonable articulable suspicion where he received a radio call regarding a man with a gun a block away, when officer drove over to that location he saw that defendant matched the description for the man with the gun, and after officer instructed defendant to "come over" to the officer, defendant ran).

1156 (9th Cir. 2019) (explaining that "[t]here is little doubt that uneven policing may reasonably affect the reaction of certain individuals—including those who are innocent—to law enforcement" and "awareness of these issues . . . can inform the inferences to be drawn from an individual who decides to step away, run, or flee from police"); *Washington*, 287 A.3d at 324-25 (explaining that "the Supreme Court has recognized that the totality of the circumstances analysis includes 'information that is accessible to people generally,' whether members of the public or police officers," and concluding that information included "the particular history of police misconduct in Baltimore," which had been "part of the 'factual and practical aspects of daily life'" for its residents); *see also*, *e.g.*, *Commonwealth v. Warren*, 58 N.E.3d 333, 342 (Mass. 2016) (concluding flight as a factor in the reasonable suspicion analysis could not be separated from recent findings in a report that the Boston Police Department had engaged in a pattern of racial profiling of African-American men). Or to put it in the words of a recent concurring opinion endorsed by five out of seven members of the California Supreme Court, the totality of the circumstances cannot be assessed "devoid of real world context," namely, the fact that many individuals "commonly hold a perception that engaging in any manner with police, including in seemingly casual or innocuous ways, entails a degree of risk to one's safety." *People v. Flores*, S267522, 2024 WL 1919992, at *10-11 (Cal. May 2, 2024) (Evans, J., concurring).

While any reasonable police officer should be aware that some individuals in highly policed communities might fear aggressive tactics, our particular focus is on what a reasonable officer "on the scene," in Mr. Mayo's case, *Posey*, 201 A.3d at 1201—i.e., a GRU officer—would have understood.[16]  The GRU officers' entrance into the Kenilworth neighborhood on the night of Mr. Mayo's arrest was not a one-off.  Sergeant Jaquez testified that his unit of the GRU was "often sent to patrol" that area and the trial court found that Mr. Mayo and his companions "knew them" and "understood . . . what they were coming to do": they were "hunting for illegal guns." The GRU has a reputation for being aggressive in that "hunt," a reputation any reasonable GRU officer would have been aware of.  *See, e.g.*, *Robinson*, 76 A.3d at

---

[16]  Although we focus here on the GRU, this court has previously acknowledged both that Black and Brown men in particular have reason to be apprehensive of police, *Dozier*, 220 A.3d at 944-45, and that this apprehension may be considered in assessing whether the actions the police observe provide reasonable articulable suspicion, *see Miles*, 181 A.3d at 641 n.14.  *See also Brown*, 925 F.3d at 1156-57 (explaining that "the burden of aggressive and intrusive police action . . . falls disproportionately on African-American, and sometimes Latino, males" and, thus, "racial dynamics in our society . . . [can] offer an innocent explanation of flight" that cannot be discounted in a reasonable suspicion analysis (internal quotation marks omitted)); *Flores*, 2024 WL 1919992, at *11 (Evans, J., concurring)  (acknowledging the "unfortunate and longstanding realities of policing in many minority communities across the country, as well as the police killings of . . . thousands of . . . people in the last decade alone" and observing that "[g]iven this context, it is apparent why attempting to avoid police officers reflects, for many people, simply a desire to avoid risking injury or death"); *Washington*, 287 A.3d at 323-25 (noting that racially disproportionate rates of police stops, arrests, and use of excessive force may give young Black men "innocent reasons" to flee police).

331-32, 339 (noting GRU's acknowledged "technique" of confronting people on the street, "ask[ing] people if they have a gun," and then "looking for a reaction," including people's "movements" in response to the question (internal quotation marks omitted)); *United States v. Gibson*, 366 F. Supp. 3d 14, 21 (D.D.C. 2018) (describing how the GRU "trawl[s]" certain "neighborhoods asking occupants who fit a certain statistical profile—mostly males in their late teens to early forties—if they possess contraband[] [d]espite lacking any semblance of particularized suspicion when the initial contact is made" (quoting *United States v. Gross*, 784 F.3d 784, 789 (D.C. Cir. 2015) (Brown, J., concurring))); *see also Jones v. United States*, 263 A.3d 445, 449, 459 (D.C. 2021) (holding GRU officers could be impeached for bias with a photograph they had taken with a unit banner featuring a bullet-pierced skull and a motto "vest up, one in the chamber" and had posted online, because the banner communicated a message that the unit's mission was to "frighten and control").[17]

---

[17] The dissent "agree[s] that, as a matter of common sense, reasonable police officers and judges should be aware of . . . [broader contextual] considerations" "such as general concerns about over-aggressive police conduct, particularly in highly policed communities and among particular groups." *Post* at 90-91. But the dissent also argues that credited evidence regarding the GRU's tactics and reputation in this case cannot inform an understanding of Mr. Mayo's flight because Justice Stevens in his separate opinion in *Wardlow* noted the possibility of these considerations, and yet the Court "gave substantial weight to flight notwithstanding." *Id*. at 90-91. The dissent is either overlooking the fact that the

The police play a critical role in ensuring public safety. But when the aggressive nature of a police presence in a community makes flight simply to avoid police interactions a plausible response, such flight cannot automatically be understood as a manifestation of consciousness of guilt and its value in a reasonable articulable suspicion analysis is significantly reduced. *See Pridgen*, 134 A.3d at 303 & n.17 (recognizing that "[a]mong some citizens, particularly minorities and those residing in high[ly] [policed] areas, there is . . . the possibility that the fleeing person . . . believes that contact with the police itself can be dangerous" (quoting *Wardlow*, 528 U.S. at 132 (Stevens, J., concurring in part and dissenting in part))).

As the totality of these facts demonstrates, Mr. Mayo and his companions were already familiar with and worried about what Mr. Lane characterized as the GRU officers' "harassment" that evening. Before Mr. Mayo fled from the GRU officers, they had communicated that they specifically suspected him (without sufficient basis, *see supra* Part II.B.1) of criminal activity and were targeting him for investigation or worse. And the GRU officers should have known that individuals such as Mr. Mayo and his companions would fear their approach and might take flight, even if they had engaged in no wrongdoing. Under these

---

record in *Wardlow* did not contain similar credited evidence or arguing that flight need not be considered in context, despite its acknowledgement to the contrary, *post* at 79; *see also post* at 94.

circumstances, the officers could not reasonably perceive Mr. Mayo's flight as clearly reflecting consciousness of guilt; rather it is more consistent with the "apprehensiveness that would naturally be felt" by a person in his situation. *Dozier*, 220 A.3d at 942.

### 3. General Locational Crime Evidence

In past cases, this court has considered whether a defendant was in a "high-crime area" in analyzing whether the police had reasonable articulable suspicion to conduct a *Terry* stop, and the government in this case urges us to consider the "high-crime-area" evidence it asserts was supplied by Sergeant Jaquez and credited by the trial court. While we reaffirm that general locational crime evidence—i.e., evidence that has no link to a particular defendant—may provide context for a defendant's actions and inform (in either direction[18]) the presence of reasonable articulable suspicion, we disavow the unhelpful "high-crime area" label. We clarify that the focus in a *Terry* analysis should be on the relevant, nonconclusory details about crime in the location in which a stop is conducted and hold that the weight to be given to such information will turn on its quality and specificity.

---

[18] *See Glover*, 589 U.S. at 386 (explaining that under a totality of the circumstances analysis "the presence of additional facts might dispel reasonable suspicion").

There is no question that locational evidence about criminal activity presented by the government can be a relevant consideration in a *Terry* analysis. In *Wardlow*, the Supreme Court affirmed the use of such evidence to put conduct observed by the police in context. 528 U.S. at 124. As noted above, the central issue in *Wardlow* was whether headlong flight after seeing police could justify a *Terry* stop, or whether more was needed. *See supra* Part II.B.2. Although the Court upheld the constitutionality of the stop, it declined to adopt a rule that flight alone would provide reasonable articulable suspicion and reaffirmed a totality of the circumstances analysis. 528 U.S. at 124-25. In so doing, the Court looked to "the relevant characteristics of a location." *Id*. at 124. Specifically, the Court observed that the officers who conducted the *Terry* stop in *Wardlow* had been "converging on an area known for heavy narcotics trafficking" "in order to investigate drug transactions" and that they "anticipated encountering a large number of people in the area, including drug customers and individuals serving as lookouts" when they saw Mr. Wardlow, standing in that area, "holding an opaque bag." *Id*. at 121-22, 124 (explaining that the officers decided to investigate "*in this context*") (emphasis added); *see supra* note 12.

In conducting its analysis, the Supreme Court in *Wardlow* made a single reference to "high crime area," explaining that "the fact that [a] stop occurred in a 'high crime area'" was "among the relevant contextual considerations in a *Terry*

analysis." 528 U.S. at 124. But nowhere did the Court indicate that it was announcing that *Terry* stops could be substantiated based on the mere affixing of a dangling comparative label of "high crime" to certain city blocks or even entire neighborhoods. 528 U.S. at 124. Such an interpretation of *Wardlow* flies in the face of its reliance on location as context for Mr. Wardlow's flight—specifically, his presence at a particular location where active drug activity was anticipated—as well as the general Fourth Amendment principle that the police must have individualized, particularized suspicion in order to conduct a *Terry* stop. *See, e.g.*, *Glover*, 589 U.S. at 385 n.1 ("reiterat[ing] that the Fourth Amendment requires . . . an individualized suspicion that a particular citizen was engaged in a particular crime"); *Armstrong v. United States*, 164 A.3d 102, 108 (D.C. 2017) ("[A] generalized description applicable to large numbers of people contradicts the Fourth Amendment's jurisprudence demanding specificity.").

Because "thousands of citizens live and go about their legitimate day-to-day activities in areas which surface . . . in court testimony[] as being high crime neighborhoods," *Smith*, 558 A.2d at 316, our court has long warned against reliance on the "high crime area" phrase as a "talismanic litany" to justify *Terry* stops, *Curtis v. United States*, 349 A.2d 469, 472 (D.C. 1975); *see also In re D.J.*, 532 A.2d at 143 (quoting *Curtis*); *Smith*, 558 A.2d at 316 (quoting *In re D.J.* (quoting *Curtis*)); *Duhart*, 589 A.2d at 900 (quoting *In re D.J.* (quoting *Curtis*)); *Cousart v. United*

*States*, 618 A.2d 96, 106 (D.C. 1992) (en banc) (quoting *Smith* (quoting *In re D.J.*));

*Jackson v. United States*, 805 A.2d 979, 990 (D.C. 2002) (quoting *Duhart* (quoting

*In re D.J.* (quoting *Curtis*))). Our abiding concern is that "residents of certain

neighborhoods in the District of Columbia may be more likely to be suspected of

engaging in criminal activity simply because of where they live or frequent," and we

have "cautioned against over-reliance on this amorphous term to support reasonable

articulable suspicion to effect a seizure." *Dozier*, 220 A.3d at 943 n.12; *see also*

*Maye v. United States*, 260 A.3d 638, 647 (D.C. 2021) (noting that "the officers'

testimony about this being a high-crime area was short on specifics" and explaining

"[w]e would need a great deal more than what the government offers here for the

location of the encounter" to provide helpful context for a reasonable articulable

suspicion analysis (internal quotation marks omitted)); *Robinson*, 76 A.3d at 340

("[R]eliance on the character of the streets . . . is not the same as the particularized,

individualized suspicion that is required under *Terry*" and "does not authorize

[police] officers to rove troubled neighborhoods and briefly detain and patdown

anyone they encounter." (internal quotation marks omitted)). Nevertheless, this

unhelpful language continues to be invoked and relied upon as a factor in the

reasonable articulable suspicion analysis, as this case illustrates.

We thus now hold that courts should no longer give weight to a bare "high-

crime area" label in assessing the validity of a *Terry* stop. Rather, consistent with

*Wardlow* and the Supreme Court's understanding of that case in subsequent opinions, the exclusive focus in assessing general locational crime information should be on the particular details that make an individual's actions more or less suspicious when viewed in context. *See Glover*, 589 U.S. at 386 (explaining that a totality of the circumstances analysis "takes into account . . . the whole picture"); *cf. McNeely*, 569 U.S. at 158 (describing *Wardlow* as an example of a "fact-intensive, totality of the circumstances analys[is,] rather than" the application of "categorical rules"). In other words, courts must consider how general locational crime information—that is, evidence that other people have committed crimes in an area—meaningfully aids in the assessment of the individualized suspicion that is constitutionally required for a *Terry* stop.

To provide a meaningful context for potentially suspicious behavior, any general evidence about crime in a location must be relevant to the conduct at issue. For example, the fact that an individual is in an area where there has been a recent spate of carjackings will not help a reasonable police officer assess whether that individual's ambiguous conduct gives rise to reasonable articulable suspicion that they are selling drugs.[19] Furthermore, conclusory assertions will not suffice; an

---

[19] We acknowledge the Supreme Court's recent statement in *Glover* that police officers must have reasonable articulable suspicion that "a particular citizen was engaged in a *particular crime*." 589 U.S. at 385 n.1 (emphasis added). But we

officer instead must be able to point to "specific evidence . . . that led the officer to suspect criminal activity in a particular circumstance." *Singleton v. United States*, 998 A.2d 295, 300-01 (D.C. 2010); *see also Terry*, 392 U.S. at 21 (explaining that "[t]he scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances"); *Milline v. United States*, 856 A.2d 616, 619 (D.C. 2004) (explaining that "in assessing the constitutionality of an investigatory stop, a court's determination of the existence of reasonable suspicion 'cannot be a mere ratification of the conclusions of others'" (quoting *Gates*, 462 U.S. at 239)); *Golden*, 248 A.3d at 941 (rejecting reliance on conclusory statements in a reasonable articulable suspicion analysis).

Beyond these requirements, assessing the value of general locational crime information in interpreting potentially suspicious conduct will be a fact-intensive inquiry. This inquiry should turn on the quality and specificity of the information,

---

need not decide whether the Court meant that literally or whether officers must have reasonable articulable suspicion as to a *particular category* of crimes. Even if we assume the latter, we conclude that the general locational crime information here did not adequately support a reasonable suspicion that Mr. Mayo was committing some offense within a category of gun-related crimes. *See infra*.

with particular focus on the recency, frequency, and geographic proximity of the relevant criminal activity. *See, e.g.*, *Washington*, 287 A.3d at 330 (explaining that to be of value in a reasonable articulable suspicion analysis, information about crime in the area "must be particularized as to the location or geographic area at issue, the criminal activity known to occur in the area, and the temporal proximity of the criminal activity known to occur in the area to the time of the stop"); *United States v. Wright*, 485 F.3d 45, 53-54 (1st Cir. 2007) (directing trial courts assessing reasonable articulable suspicion to consider "the nexus between the type of crime most prevalent or common in the area and the type of crime suspected in the instant case," the "limited geographic boundaries of the 'area' or 'neighborhood' being evaluated," and the "temporal proximity between evidence of heightened criminal activity and the date of the stop or search at issue"); *United States v. Montero-Camargo*, 208 F.3d 1122, 1138 & 1139 n.32 (9th Cir. 2000) (en banc) (explaining that, to be relevant in an assessment of reasonable articulable suspicion, consideration of "high crime area" evidence—a term the court recognized "may well be an invitation to trouble"—must be "limited to specific, circumscribed locations where particular crimes occur with unusual regularity" and instructing courts to consider the underlying support for any assertions about crime levels in a particular

area so as not to "tar people with the sins of their neighbors"), *cert. denied*, 531 U.S. 889 (2000).[20]

We entrust trial courts with the obligation in the first instance to conduct a careful assessment of any general locational crime information and to ascribe to this locational information only the weight as is appropriate based on the record created. Here, we conclude that the trial court, at least initially, rightly declined to find that Sergeant Jaquez's testimony about crime in the location of Mr. Mayo's arrest

---

[20] There is nothing "rigid" about this inquiry. And none of the cases the dissent cites as having "declined to impose rigid prerequisites to the consideration of general locational crime evidence," *post* at 96-97, undermine our observation that the value of general locational crime information will depend on its relevance, quality, and specificity. In *United States v. Weaver*, 9 F.4th 129, 151 n.86 (2d Cir. 2021) (en banc), the Second Circuit rejected the notion that "[s]tatistical data . . . [is] required" before general locational crime evidence may become relevant, but we impose no such requirement in this decision. In *United States v. Guardado*, 699 F.3d 1220, 1222-23 (10th Cir. 2012), the Tenth Circuit upheld reliance on a "area's disposition toward criminal activity as a factor that contributes to an officer's reasonable suspicion," seemingly referring to a detective's conclusory testimony that the defendant was in "an extremely high crime area," without requiring supporting information of *any* kind, a position even the dissent appears to disavow. *Post* at 94-95. And in *United States v. Baskin*, 401 F.3d 788, 792-93 (7th Cir. 2005), the Seventh Circuit actually relied on general locational crime information that we too would accord weight: the defendant was stopped late at night, in a remote area, in "close proximity to a newly discovered methamphetamine lab."

provided objectively useful context for Mr. Mayo's actions in a reasonable articulable suspicion calculus.[21]

Sergeant Jaquez's vague testimony about narcotics activity had no demonstrated connection to a suspicion that Mr. Mayo was armed.[22] Although relevant, his testimony about guns lacked meaningful specificity. His assertion that in three years he had "recovered multiple weapons, handguns and also narcotics," provided no geographic boundaries other than that this police work had occurred in "the Kenilworth area." He apparently gestured to a map, but that map was not introduced into evidence, *see supra* note 1, and the trial court's finding that he had identified "a particular neighborhood" of unknown boundaries, not "the entire District of Columbia," is hardly support for particularized suspicion.

---

[21] After initially granting Mr. Mayo's motion to suppress, the court reconsidered its ruling and overcame the "difficulty" it previously had with Sergeant Jaquez's testimony. The court indicated that it did not matter whether it was objectively true that Mr. Mayo was seized in a "high crime area"; instead, what was "in the mind of the officer" was dispositive. But the law is the exact opposite. In evaluating the legality of a stop, "it is imperative that the facts be judged against an objective standard," lest Fourth Amendment guarantees be left "to the discretion of the police." *Terry*, 392 U.S. at 21-22.

[22] At trial, Officer Wright asserted that the whole "neighborhood" was "an open-air drug market." The government does not seek to rely on this testimony; even if it had, our analysis would not change. Such unsubstantiated hyperbole is less than helpful in assessing reasonable articulable suspicion.

Further, Sergeant Jaquez's estimate that his unit had recovered "over 10 guns" in a three-year period was weak tea at best. He provided no meaningful detail about how these guns had been detected and recovered. We do not know whether the ten guns Sergeant Jaquez referenced were recovered from individual street (or alley) seizures as opposed to one or more home raids conducted with a warrant. While the recovery of any unlicensed handguns in a neighborhood is understandably concerning to its residents and visitors, the fact that an average of three to four guns had been recovered per year in an undefined geographic area without a basis of comparison (other than Sergeant Jaquez's vague assertion that this number was "one of the . . . higher amounts of guns [the GRU had] recovered compared to other parts of the city") adds little to the contextual consideration of location in a reasonable articulable suspicion analysis. *See Maye*, 260 A.3d at 641-42, 646-47 (concluding that similarly vague testimony that over the course of five or more years officers had confronted multiple individuals with guns or drugs on a specific block did not provide meaningful context for evaluating "innocuous behavior like adjusting one's waistband" in a reasonable articulable suspicion analysis); *see also State v. Goldsmith*, 277 A.3d 1028, 1040-41 (N.J. 2022) (acknowledging that "the character and prevalence of crime in an area—although insufficient on its own to support particularized suspicion—can be one factor in determining whether reasonable suspicion exist[s]," but cautioning that the State must provide "at least some

evidence to support the assertion" that the character of the area is relevant and concluding that an officer's testimony that a particular block had been the site of "shootings" and he had seen "[f]ive to ten" drug transactions and arrested individuals there over the course of his twenty-year career was too "vague" to provide such a foundation).

In sum, we cannot say that the general locational crime information that the government presented was sufficiently specific or well-grounded to place Mr. Mayo's innocuous conduct in a different light or make his flight more indicative of consciousness of guilt.

### 4. Totality of the Circumstances

Having separately examined (1) the GRU officer's initial observations of Mr. Mayo; (2) Mr. Mayo's flight from the GRU officers; and (3) the general location crime evidence presented by the government, we now consider whether, collectively, the "totality of the[se] circumstances" supports a determination that the GRU officers had reasonable articulable suspicion to seize Mr. Mayo. *Arvizu*, 534 U.S. at 274 (internal quotation marks omitted). We conclude it does not.

To reiterate, the GRU officers did not see "any criminal activity afoot" as they approached Mr. Mayo and his companions; at most, they observed the group

disperse and witnessed, from behind, Mr. Mayo move his hands somewhere in the vicinity of his waistband. Mr. Mayo then took flight after three GRU officers, who should have known that individuals might fear their aggressive tactics, began approaching Mr. Mayo from different angles and asked him if he had "any guns" in a way that indicated they suspected him of criminal activity. These actions took place in a location which the government argued was within a "high-crime area," but especially without a comparator we are unconvinced that the number of seizures—ten guns over a three-year period—was "high," and the government's evidence lacked any meaningful specificity about the nature of these seizures or the boundaries of the "area" within which they were conducted. Even taken together, we cannot say these facts establish that GRU officers had reasonable articulable suspicion that Mr. Mayo was engaged in criminal activity prior to seizing him. At most, the facts establish that GRU officers had an inchoate and unparticularized hunch that Mr. Mayo was carrying a weapon.

In making this decision, we rely Supreme Court decisions discussed earlier in this opinion and the principles we extract therefrom. We acknowledge we are bound by *Wardlow* and *Wesby* in particular, but those cases, with their very different records creating a very different mosaic of facts, only get us so far. *Ornelas*, 517 U.S. at 696, 698 (explaining that the "fluid concept[]" of reasonable suspicion "take[s] [its] substantive content from the particular contexts in which [it is] being

assessed" and "the mosaic which is analyzed for a reasonable-suspicion . . . inquiry is multi-faceted"). Hewing to their facts as if they constituted some sort of precise measuring stick would "impose a rigid structure on the concept of reasonableness," *Glover*, 589 U.S. at 384, that the fundamental Fourth Amendment inquiry—examining whether a search or seizure of a particular individual is reasonable under the totality of the circumstances—does not allow. *See Johnson v. United States*, 253 A.3d 1050, 1062 (D.C. 2021) (Blackburne-Rigsby, C.J., concurring) (cautioning that *Wardlow* should not be applied so "formulaically" that consideration of flight and "high crime" evidence "become[s] a substitute for requiring police officers to have *particularized* suspicion of an individual's suspected criminal activity prior to a lawful seizure").

Hence, we look beyond those cases to our court's decisions for additional guidance. *See, e.g.*, *Miles*, 181 A.3d 633; *Posey*, 201 A.3d 1198. We acknowledge that, like the Supreme Court's decisions, they are not factually on all fours with this case either. But they fill out the picture of the definition-defying concept of reasonable articulable suspicion, *see Ornelas*, 517 U.S. at 695, and inform this en banc court's understanding of the requisite Fourth Amendment analysis, an analysis which was undertaken in this case precisely because the law was perceived to need clarification.

We also look to decisions from other courts to support our conclusion that Mr. Mayo's seizure, based on little more than his flight from the GRU and weak general locational crime evidence, was not a lawful *Terry* stop. Some of these cases helpfully analyze flight evidence, and others analyze general locational crime evidence, *see supra*. Some address both of these considerations. *See, e.g.*, *United States v. Conerly*, 75 F. Supp. 3d 1154, 1157, 1165 (N.D. Cal. 2014) (ruling that officers lacked reasonable articulable suspicion to detain Mr. Conerly based on evidence that after the police saw him walking down the street in an area the police asserted but failed to substantiate was "commonly frequented by individuals possessing firearms and engaging in drug dealing" and told him to stop, he "immediately fled"); *McKinney v. State*, 444 S.W.3d 128, 130, 133, 134 (Tex. App. 2014) (holding defendant's "flight . . . without more" could not justify a *Terry* stop and defendant's presence in an area the police simply asserted was "known for" "numerous drug complaints," a "lot of gang activity" and "multiple shootings" did not combine with his flight to give the police reasonable articulable suspicion); *Monjaras v. State*, 679 S.W.3d 834, 848-49 (Tex. App. 2023) (holding that officers lacked reasonable articulable suspicion to seize and search the defendant who officers testified was in a "high-crime" area, appeared "nervous[]," and may have run from police); *People v. Harris*, 957 N.E.2d 930, 935-38 (Ill. App. Ct. 2011) (holding that officers lacked reasonable articulable suspicion to stop a defendant

where officers testified that the defendant ran from police and offered "[a] conclusory and unsubstantiated statement" about "the level of crime in the area where defendant was stopped"); *D.R. v. State*, 941 So.2d 536, 537-38 (Fla. App. Ct. 2006) (holding that officers lacked reasonable articulable suspicion to stop defendant where defendant ran after two officers drove up beside her in an area where there had been "multiple narcotic complaints" over "some unknown" period of time).[23]

That said, we are wary of over-relying on attempts at case matching. We recognize that in this fact-specific context, "two cases are seldom sufficiently alike," *Gomez v. United States*, 597 A.2d 884, 889 (D.C. 1991), and, further, that the nature of policing and reasonable expectations of privacy and personal autonomy are not static concepts. Requiring us to identify a precise predicate case match before we

---

[23] We are unpersuaded by the cases the dissent perceives to be comparable to Mr. Mayo's where courts determined a seizure was supported by reasonable articulable suspicion. Notably, the government's reports of "high crime" in the area went unchallenged in all of these cases. *See Jeter*, 721 F.3d at 754-55; *United States v. Bridges*, 382 F. Supp. 3d 62, 65 (D.D.C. 2019); *United States v. Jones*, 609 F. Supp. 2d 113, 124 (D. Mass. 2009); *United States v. Smith*, 633 F.3d 889, 894 (9th Cir. 2011); *McGee v. State*, 818 So.2d 558, 559 (Fla. App. Ct. 2002). And these cases have other legally and factually distinguishing features. For instance, in *Jeter*, 721 F.3d at 755, the Sixth Circuit appeared to rely in part on the defendant's after-the-fact admission he had a gun to justify his seizure, which we deem impermissible. And in *Bridges*, 382 F. Supp. 3d at 64-65, 70, and *Jones*, 609 F. Supp. 2d at 120-23, 128, the courts' conclusions that officers had reasonable articulable suspicion to seize individuals who fled from them in "high crime" areas rested in part on the fact that the police were responding to specific reports of relevant crime in the area, which was not the case here.

acknowledge a Fourth Amendment violation would stifle any development in this inherently dynamic area of the law.

Because we conclude that the facts of this case did not give rise to reasonable articulable suspicion, we hold Sergeant Jaquez's seizure of Mr. Mayo was unlawful and violated his rights under the Fourth Amendment.

## C.    Whether the Evidence Should Be Suppressed

When it sought rehearing en banc, the United States addressed only the division's holding that the officers lacked reasonable articulable suspicion. The order granting rehearing en banc did not explicitly indicate that rehearing en banc was being granted only on that issue. Moreover, the en banc court's order vacated the division's decision in its entirety and directed the parties to file new briefs to supersede the earlier briefs in the case. Understandably, the parties briefed and argued before the en banc court not only the issue of reasonable articulable suspicion but also exclusionary-rule issues. Although the en banc court's initial order was not clear on this point, we granted review only with respect to the issue of reasonable articulable suspicion. The en banc court therefore does not address the exclusionary-rule issues. *See Mashaud v. Boone*, 295 A.3d 1139, 1148 n.3 (D.C. 2023) (en banc) (explaining that petitioner's failure to raise a sufficiency issue in a petition for rehearing en banc would give us grounds "to bypass [that issue] entirely").

Accordingly, we reinstate Part II.C of the division opinion, *Mayo*, 266 A.3d at 268-72, concluding the evidence recovered subsequent to Mr. Mayo's seizure—the drugs found on his person as well as the gun and drugs he apparently discarded or handed off to another person after Sergeant Jaquez seized him and he pulled away—must be suppressed pursuant to the exclusionary rule. We also reinstate Part V of Judge McLeese's dissent, *id*. at 282-83.

## III. Conclusion

For the reasons set forth above, we hold that Mr. Mayo was illegally seized, and the physical evidence obtained by the police from his person and in the area of his flight should have been suppressed. Accordingly, we vacate Mr. Mayo's convictions and remand for further proceedings consistent with this opinion.

*So ordered.*

McLEESE, *Associate Judge*, dissenting: The en banc court holds that the police violated Mr. Mayo's Fourth Amendment right to be free from an unreasonable seizure of his person. Although I view this as a close case, I ultimately conclude that the seizure of Mr. Mayo was lawful. Moreover, for the reasons given in the reinstated portion of my dissent as a member of the division, I believe that the trial

court should consider in the first instance whether suppression of the evidence would be warranted under the exclusionary rule. *See Mayo v. United States*, 266 A.3d 244, 282-83 (D.C. 2022) (McLeese, J., dissenting). I therefore respectfully dissent.

## I. The Factual and Procedural Background

### A. The Evidence at the Suppression Hearing

The opinion of the en banc court describes the evidence at the suppression hearing. *Supra* at 4-10. In sum, the United States's evidence was as follows. Police officers wearing badges drove an unmarked cruiser into an alley in the Kenilworth neighborhood. The officers worked in the Gun Recovery Unit ("GRU"), which often patrolled in that area. In the preceding three years, the GRU had recovered narcotics and ten or more guns from the area. That was "one of the . . . higher amounts," compared to other areas of the city. One of the officers, Sergeant Jaquez, focused on Mr. Mayo, who had been standing with a group of other individuals. Mr. Mayo walked over to a man in a wheelchair. Mr. Mayo was facing away from Sergeant Jaquez, who therefore could not see Mr. Mayo's hands. Sergeant Jaquez saw Mr. Mayo's shoulders moving up and down, and he believed that Mr. Mayo was making adjustments in the area of his front waistband. After a few seconds, Mr. Mayo left the man in the wheelchair and walked away from the officers. Three officers got out of the cruiser and began walking toward Mr. Mayo. One of them

said to Mr. Mayo, "Hey, we just want to talk. We just want to talk to you. Do you have any guns?" Mr. Mayo then began to run, at which point Sergeant Jaquez tripped him. Mr. Mayo continued to flee, but other officers apprehended him. *Id.*

As the opinion of the en banc court explains, *supra* at 8-10, Mr. Lane, a defense witness who was present during the incident, testified to a somewhat different version of events. In sum, Mr. Lane testified that a car including four police officers approached a group that included Mr. Lane and Mr. Mayo. The officers asked the group if they had any guns, and in response all of the members of the group lifted up their jackets to show the police that they did not have any guns. The officers then got out of the car, which worried the group, so everyone in the group scattered and ran away from the officers. Mr. Lane further testified that when the police come into the neighborhood the group knows what the police are coming for, so the members of the group automatically show their waistbands. *Id.*

## B. The Trial Court's Factual Findings

As the opinion of the en banc court explains, the trial court initially granted the motion to suppress but then reconsidered and denied the motion. *Supra* at 10-14. In sum, the trial court made the following factual findings in the course of those rulings.

The trial court credited Mr. Lane's testimony that the group dispersed when the police arrived because, as the trial court put it, the group knew the officers as members of the GRU who were "regular[s]," and the members of the group therefore knew what the officers were coming to do. (The trial court's description of Mr. Lane's testimony on this point ran somewhat beyond Mr. Lane's actual testimony, as described above.) Mr. Mayo walked over to the man in the wheelchair and made motions around his groin area that Sergeant Jaquez said created a suspicion of weapons. Sergeant Jaquez did not see Mr. Mayo's front, however, and did not see a bulge. The running began when Sergeant Jaquez went over to Mr. Mayo and asked if Mr. Mayo had a gun.

With respect to the evidence of prior crime in the neighborhood, the trial court credited Sergeant Jaquez's testimony that the GRU had recovered ten guns in the Kenilworth neighborhood in the preceding three years.

## C. The Standard of Review and Consideration of Trial Evidence

The decision of the en banc court "retire[s] . . . unhelpful and potentially confusing" language in our prior cases stating that our review of suppression rulings is "narrow" or "limited." *Supra* at 15 (internal quotation marks omitted). I agree with the en banc court on that point. I further agree that we must decide de novo the legal issues presented in this case. *Id.* I therefore see no need to discuss the trial

court's legal analysis in either the initial or the final suppression ruling. I also agree that we review the trial court's factual determinations for clear error. *Id.* Finally, I agree with the decision of the en banc court to assume without deciding that where the trial court made no explicit finding, this court should view the evidence in the light most favorable to the trial court's ultimate suppression ruling. *Id.* at 17-18.

I see two points as more complicated. First, I am skeptical of the en banc court's statement that this court can appropriately reverse a trial court's suppression-hearing ruling based on facts that this court itself finds for the first time on appeal simply because this court views the evidence at the suppression hearing with respect to those facts to be "undisputed." *Supra* at 16. I can agree that this court could treat something as fact, even if not found by the trial court, if it would be clear error to reach any other conclusion given the record at the suppression hearing. In general, though, "[w]here [factfinders] of reason and fairness may entertain differing views as to the truth of the testimony, whether it be uncontradicted, uncontroverted or even undisputed, evidence of such a character is for the trier of fact." *Hamilton v. Hojeij Branded Food, Inc.*, 41 A.3d 464, 473 (D.C. 2012) (brackets and internal quotation marks omitted).

Second, the en banc court acknowledges that our prior decisions are inconsistent on whether this court can rely on "undisputed" trial testimony to reverse

a trial court's suppression ruling. *Supra* at 30-31 n.8. For reasons that I explained in my dissent as a member of the division, *Mayo*, 266 A.3d at 275-76 (McLeese, J, dissenting), in my view our prior binding authority precludes such use of trial testimony. The en banc court declines to decide the issue. *Supra* at 30-31 n.8. I have no objection to that approach, because the parties have not squarely presented the issue for decision in this case and because I agree that we need not decide the issue to resolve this case. In an appropriate case, though, I would be inclined to reiterate our binding holdings that "undisputed" trial testimony cannot be relied upon by this court as a basis for reversing a trial court's suppression ruling. More broadly, in an appropriate case I would be tentatively inclined to reconsider our prior holdings that "undisputed" trial testimony can be considered in support of the trial court's suppression ruling. Although that principle is a longstanding one, I have come to doubt its wisdom and fairness. Among other things, the principle seems to me to place an unreasonable burden on defense counsel to monitor the trial for evidence that might be relevant to a previously decided suppression ruling and to dispute that evidence in some way even if there is no reason to do so for purposes of the jury's determination of guilt or innocence.

## II. Analysis

The opinion of the en banc court holds that Mr. Mayo was seized when Sergeant Jaquez tripped him. *Supra* at 19-22. I agree with that holding. I respectfully disagree, however, with the en banc court's holding that the police lacked reasonable, articulable suspicion to seize Mr. Mayo.

### A. General Fourth Amendment Principles

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. It is undisputed in this case that the initial seizure of Mr. Mayo was an investigative detention (also called a *Terry* stop) and therefore was lawful if Sergeant Jaquez had "a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation marks omitted). From a layperson's perspective, one might think that Sergeant Jaquez obviously had reasonable grounds to suspect Mr. Mayo. Sergeant Jaquez was in a neighborhood in which his unit had recovered ten guns in the prior three years, which was one of the higher amounts compared to other parts of the city; when the police arrived, Mr. Mayo walked over to another person and made movements that, viewed from behind, led Sergeant Jaquez to infer that Mr. Mayo was adjusting his waistband; and Mr. Mayo started running right after Sergeant Jaquez asked Mr. Mayo if he had a gun. In my view, it would be quite

natural to say that Sergeant Jaquez stated facts that led him to reasonably *suspect* that Mr. Mayo *may* have been committing a criminal offense.

The concept of reasonable, articulable suspicion has been described as governed by "common sense and ordinary human experience." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). The concept has not, however, actually been interpreted entirely in layperson's terms. As the Supreme Court explained when it recognized *Terry* stops, determining the permissible scope of *Terry* stops requires balancing "the need to . . . seize against the invasion which the . . . seizure entails." *Terry v. Ohio*, 392 U.S. 1, 21 (1968) (parentheses and internal quotation marks omitted).

On one hand, *Terry* stops can advance the "weighty social objective," *Schall v. Martin*, 467 U.S. 253, 264 (1984) (internal quotation marks omitted), of "effective crime prevention and detection," *Terry*, 392 U.S. at 22. On the other hand, *Terry* stops implicate the vital interest in the "sanctity of the individual." *Terry*, 392 U.S. at 26.

*Terry* stops are "substantially less intrusive" than full custodial arrests. *Dunaway v. New York*, 442 U.S. 200, 210 (1979). Nevertheless, *Terry* stops are serious intrusions upon personal liberty and privacy. *See, e.g.*, *United States v. Street*, 917 F.3d 586, 592 (7th Cir. 2019) ("An investigative stop under *Terry*

imposes a substantial intrusion on a person's liberty and dignity."); *cf. Berkemer v. McCarty*, 468 U.S. 420, 436 (1984) (traffic stop "significantly curtails the freedom of action of the driver and the passengers") (internal quotation marks omitted). During a *Terry* stop of an individual, the police by definition restrain the individual's freedom of movement. *Terry*, 392 U.S. at 19 n.16. If the circumstances make it reasonable to do so, officers during a *Terry* stop may also (1) use physical force to seize the individual (as Sergeant Jaquez did in this case), *id.* at 28; (2) conduct a limited search, *i.e.*, a frisk, of the individual's person for weapons, *id.* at 25-26, 29; and (3) place the individual in handcuffs, *Womack v. United States*, 673 A.2d 603, 608-10 (D.C. 1996). A *Terry* stop must be reasonable in duration, but such stops can permissibly last for a significant time. *Compare Sharpe*, 470 U.S. at 682-88 (upholding *Terry* stop lasting twenty minutes), *and McIlwain v. United States*, 568 A.2d 470, 473 (D.C. 1989) (upholding *Terry* stop lasting thirty minutes), *with United States v. Place*, 462 U.S. 696, 709-10 (1983) (holding that, under circumstances, *Terry* stop lasting ninety minutes was unreasonably long).

Given the serious consequences of *Terry* stops, the degree of suspicion adequate to permit such stops must be set sufficiently high to strike an appropriate balance between the important interests at stake. The opinion of the en banc court accurately summarizes the general guidance that the Supreme Court has provided about the degree of suspicion that is required. *Supra* at 22-27. In sum, reasonable,

articulable suspicion (1) is "not reducible to precise definition or quantification," *Florida v. Harris*, 568 U.S. 237, 243 (2013) (internal quotation marks omitted); (2) is a "commonsense, nontechnical conception[]," *Ornelas v. United States*, 517 U.S. 690, 695 (1996); (3) turns on the "totality of circumstances," *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted); (4) requires considerably less than proof by a preponderance and obviously less than probable cause, *Kansas v. Glover*, 589 U.S. 376, 380 (2020), although probable cause is also "incapable of precise definition or quantification into percentages," *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) (internal quotation marks omitted); and (5) requires more than an "inchoate and unparticularized suspicion or hunch of criminal activity," *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (internal quotation marks omitted); *see also Alabama v. White*, 496 U.S. 325, 329-30 (1990) ("The Fourth Amendment requires some minimal level of objective justification for making the stop.") (internal quotation marks omitted).

I pause to acknowledge the difficulties confronted by both law-enforcement officers and judges in applying the "reasonable, articulable suspicion" standard. Officers deciding whether a *Terry* stop is appropriate must make "difficult split-second judgments" based on a standard that has not been and cannot be clearly defined and that turns on a "fact-intensive, totality of the circumstances" analysis. *Missouri v. McNeely*, 569 U.S. 141, 158 (2013) (plurality opinion of Sotomayor, J.);

*cf., e.g., Graham v. Connor*, 490 U.S. 386, 396-97 (1989) ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").

Judges obviously have much more time to decide, and we make our decisions free from the risks that law-enforcement officers face. Nevertheless, applying the "reasonable, articulable suspicion" standard can be quite challenging for judges as well. We too must apply a standard that has not been and cannot be clearly defined and that turns on a fact-intensive analysis of the totality of the circumstances.

The idea that law-enforcement officers and judges should take a commonsense approach to the issue seems to me to provide somewhat limited assistance. Reasonable people often disagree both about how suspicious given circumstances are and about how much suspicion should suffice to make it reasonable for law-enforcement officers to seize an individual. For example, the members of both the Supreme Court and this court not infrequently divide in cases presenting the question whether law-enforcement officers had reasonable, articulable suspicion in given circumstances. *See, e.g., Glover*, 589 U.S. 376 (6-3 decision); *Navarette v. California*, 572 U.S. 393 (2014) (5-4 decision); *Wardlow*,

528 U.S. 119 (5-4 decision); *Miles v. United States*, 181 A.3d 633 (D.C. 2018) (2-1 decision); *Armstrong v. United States*, 164 A.3d 102 (D.C. 2017) (2-1 decision).

A law-review article from a fair while ago further illustrates the challenges that judges face when applying the "reasonable, articulable suspicion" standard. *See* C.M.A. McCauliff, *Burdens of Proof: Degrees of Belief, Quanta of Evidence, or Constitutional Guarantees?*, 35 Vand. L. Rev. 193 (1982). The author of that article sent a questionnaire about burdens of proof and related topics to all federal district judges, all federal circuit judges, and the Justices of the Supreme Court. *Id.* at 1325 n.184. One of the questions asked the judges to assign a numerical probability to "reasonable suspicion." *Id.* The judges who responded with a number gave a wide range of answers: for example, approximately 15% of the judges gave a probability of 10%; approximately 20% of the judges gave a probability of 20%; approximately 30% of the judges gave a probability of 30%; approximately 13% of the judges gave a probability of 40%; and approximately 14% of the judges gave a probability of 50%. *Id.* at 1327-28.

To be clear, the foregoing is not intended as a criticism of current doctrine. Rather, I am simply trying to identify some of the structural features that in my view make cases like this one difficult to resolve.

## B. The Initial Observations of Mr. Mayo

I largely agree with the en banc court's discussion of the officers' initial observations of Mr. Mayo. *Supra* at 27-33. Specifically, I agree that, considered in isolation, the mere fact that the members of the group dispersed when the police arrived provided little support for a seizure. *Id.* at 27-29. I also agree that, considered in isolation, Mr. Mayo's shoulder movements, as described by Sergeant Jaquez during the suppression hearing, also provided quite limited support for a seizure. *Id.* at 29-33.

I note, however, that hand movements that "are consistent with mundane behavior," *supra* at 31, can contribute to reasonable, articulable suspicion, when considered in the context of the totality of the other circumstances of a given case. For example, imagine a case in which the police have received an anonymous tip that an individual has a weapon in the individual's right jacket pocket. If the police go to the scene and see the individual repeatedly reaching into the individual's right jacket pocket, that conduct—though "consistent with mundane behavior"—would contribute to articulable suspicion. Of course, more would be needed to establish reasonable, articulable suspicion, but that is a different question.

## C. Flight in General

The opinion of the en banc court discusses the significance of Mr. Mayo's flight *supra* at 33-51. I first discuss flight evidence in general, *see infra* at 80-82, and I then turn to an analysis of the flight evidence in this case, *see id.* at 82-95.

On the general topic of flight evidence, I agree with the opinion of the en banc court on a number of points: (1) people sometimes flee from the police for reasons other than consciousness of guilt; (2) flight by itself does not automatically justify a *Terry* stop; (3) the degree to which flight contributes to reasonable, articulable suspicion depends on context; (4) the nature of the police actions before an individual's flight is part of that context; (5) the relevant context also includes circumstances such as whether the police have singled out the suspect or asked explicitly or implicitly accusatory questions; (6) some of our prior decisions have taken an unduly categorical, rather than an appropriately contextual, approach to assessing the significance of flight; and (7) the en banc court appropriately disavows a categorical, box-checking approach to flight.

My view of the proper general approach to flight evidence differs in two important respects, however, from the views reflected in the opinion of the en banc court. First, the en banc court does not acknowledge the well-settled principle that *Terry* stops can permissibly be based on police observations of actions that might

have an innocent explanation, as long as those actions, considered as a whole, are sufficiently suspicious. *See Wardlow*, 528 U.S. at 125 (Although "there are innocent reasons for flight from police and . . . flight is not necessarily indicative of ongoing criminal activity[,] . . . [that] does not establish a violation of the Fourth Amendment. Even in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation."). So the mere fact that flight from the police might in some circumstances be lawful and innocent does not preclude flight's consideration as part of the totality of circumstances bearing on whether a *Terry* stop was permissible.

Second, after discussing at length reasons why Mr. Mayo's flight might have been innocent rather than reflecting consciousness of guilt, *supra* at 34-37, 40-51, the opinion of the en banc court reaches the following overall conclusion: "[T]he officers could not reasonably perceive Mr. Mayo's flight as *clearly* reflecting consciousness of guilt; rather it is more consistent with the apprehensiveness that would naturally be felt by a person in his situation." *Id.* at 51 (emphasis added and internal quotation marks omitted). Even assuming that a reasonable officer should have concluded that Mr. Mayo's flight more likely than not reflected only innocent fear of the police rather than any consciousness of guilt, *but see infra* at 82-95, it does not follow that Mr. Mayo's flight should be given little weight in determining

whether the totality of the circumstances supported a conclusion of reasonable suspicion in this case.

I do not see how a potentially suspicious factor (here flight) can appropriately be given little weight in the totality-of-the-circumstances analysis simply because that factor itself is not "clearly" incriminating. As the opinion of the en banc court acknowledges, *supra* at 23-25, reasonable, articulable suspicion requires considerably less than a preponderance of the evidence. In other words, reasonable, articulable suspicion can exist even if *all* of the relevant factors, taken together, are not clearly—or even not more likely than not—incriminating. Moreover, reasonable, articulable suspicion is based on the totality of the circumstances. It necessarily follows that individual factors cannot properly be given little weight because in isolation they are not clearly incriminating. *See, e.g.*, *Arvizu*, 534 U.S. at 274 (courts should not utilize a "divide-and-conquer analysis" by evaluating and rejecting factors in isolation rather than considering factors collectively).

## D. Flight in this Case

In determining how much weight to give Mr. Mayo's flight in the circumstances of this case, we are required to take a "commonsense, nontechnical [approach] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Ornelas*, 517

U.S. at 695 (internal quotation marks omitted).  As I have already confessed, however, common sense provides me with little guidance in assessing in concrete terms how suspicious Mr. Mayo's flight was in the circumstances of this case.  I take as a given—both as a matter of common sense and as a matter of legal doctrine—that flight is generally ambiguous: some people flee from the police because they are committing or have committed crimes and fear detection or apprehension; some people flee from the police for innocent reasons, including fear of how they will be treated by the police; and some people have both reasons for fleeing.  *See, e.g.*, *Wardlow*, 528 U.S. at 124 (flight "is not necessarily indicative of wrongdoing").  If I try to be more concrete about the weight to give flight in a given context, however, common sense starts to fail me, and I start wondering about many factual and legal questions.  What percentage of people who flee from the police are in fact fleeing because they have been committing crimes and fear detection, and what percentage flee solely for other reasons?  To what extent do those percentages vary depending on where one is in the United States, the personal characteristics of the individual who flees, the nature of the interaction between the police and the individual before the individual flees, or many other circumstances that might be present in a given case?  To what extent do those percentages vary over time, for example, in response to changing law-enforcement practices and social attitudes about law enforcement?  How could data be generated or evidence introduced to try to answer some of those

questions?  To what extent are officers charged with knowledge (commonsense or otherwise) about the answers to such questions?  To what extent does the Fourth Amendment analysis properly depend on the answers to such questions, so that, for example, flight might be treated as significantly more suspicious in place A than in place B, depending on local differences, or as substantially more suspicious in case A than in case B, based on statistical or other evidence that was introduced in one case but not the other?  Perhaps these questions suggest that I am struggling with the idea that a judge is supposed to decide the significance of flight as a "reasonable and prudent [person]" rather than a "legal technician."  *Ornelas*, 517 U.S. at 695 (internal quotation marks omitted).  In part, though, I believe these questions suggest that the issue to be resolved here is not entirely a matter of common sense.

Fortunately, we are not left to rely solely on our own common sense.  The Supreme Court has told us two specific things about flight, apparently based on the common-sense beliefs of a majority of the Justices of the Supreme Court, and those statements are binding on us as far as they go.  The Supreme Court said in *Wardlow* that "[h]eadlong flight . . . is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."  528 U.S. at 124.  And in *Wesby*, the Supreme Court said that "deliberately furtive actions and flight at the approach of law officers are *strong* indicia of *mens rea*."  583 U.S. at 59 (ellipsis and internal quotation marks omitted).

Those statements provide somewhat more concrete guidance about how to view the flight in this case. First, *Wardlow* appears to treat "headlong flight," which is present in this case, as particularly suspicious. 528 U.S. at 124. Second, *Wesby* stated that flight "at the approach of law officers" is a strong indicator of a guilty mind. 583 U.S. at 59 (ellipsis and internal quotation marks omitted). In my view, the latter statement points strongly against a broad theory that flight is rendered substantially less suspicious simply because police officers approached the individual before the individual fled. Third, *Wardlow* emphasized that the flight in that case was "unprovoked," 528 U.S. at 125, which suggests that the weight to be given to flight may well depend on whether prior police conduct was of a nature to increase the likelihood that even innocent persons might flee to avoid the police.

The opinion of the en banc court does not explicitly rely on the idea that the GRU officers "provoked" Mr. Mayo's flight. *Supra* at 41-51. The opinion's description of the GRU officers' conduct, however, seems to clearly indicate that the en banc court views the flight in this case as provoked. *Id.* As I explained in my dissent as a member of the division, I view that as a more complicated question. *Mayo*, 266 A.3d at 277-78 (McLeese, J., dissenting). Mr. Mayo's flight probably was "provoked" by the police in the broadest sense of that term. Mr. Mayo presumably would not have started running if the police had not driven up, gotten out of their cruiser, approached Mr. Mayo, and asked him if he had a gun. But the

Supreme Court described the flight in *Wardlow* as "unprovoked," 528 U.S. at 124, even though Mr. Wardlow presumably would not have fled if the police cars had not driven into the area. In fact, in cases such as *Wardlow* and this case, the individual's flight is viewed as potentially suspicious precisely because that flight appears to have been prompted by the individual's awareness that the police were present. *Wardlow*, 528 U.S. at 124. In other words, the Supreme Court necessarily understands "provoked" to mean something more than simply "caused by."

I agree with the en banc court that Mr. Mayo's flight occurred in response to police actions that had a greater risk of provoking innocent flight than was present in *Wardlow*, where the officers simply drove into the area. I further agree that that distinction between the two cases means that the flight in this case should properly be viewed as more ambiguous, and therefore less suspicious, than the flight in *Wardlow*. But to the extent that the en banc court in this case views the GRU's conduct during the incident as so provocative that Mr. Mayo's flight contributed little to reasonable, articulable suspicion, *supra* at 50-51, I disagree.

My disagreement with the en banc court on this point has both factual and legal components. On the factual side, the evidence at the suppression hearing was that officers drove into the area, three officers got out of their cruiser and walked toward Mr. Mayo, one officer asked Mr. Mayo if he had a gun, and Mr. Mayo fled.

*Supra* at 67-68. Particularly if the evidence is viewed in the light most favorable to the trial court's ultimate suppression ruling, I do not believe that the record supports the statements in the opinion of the en banc court that the officers' conduct would have signaled to Mr. Mayo that the officers "did not intend to allow [Mr. Mayo] to leave" and instead "planned to stop him" rather than merely speaking with him. *Supra* at 42-43, 41.

On the legal side, the en banc court's analysis rests heavily on a comparison of this case to *Miles v. United States*, 181 A.3d 633 (D.C. 2018), *Golden v. United States*, 248 A.3d 925 (D.C. 2021), and *Dozier v. United States*, 220 A.3d 933 (D.C. 2019). *Supra* at 42-45. I do not view those comparisons as apt, and I therefore do not view those decisions as supporting a conclusion that Mr. Mayo's flight in this case added little to reasonable, articulable suspicion. In *Miles*, the court did conclude that Mr. Miles's flight was "not unprovoked to the same extent as the defendant's flight in *Wardlow*." 181 A.3d at 645 (internal quotation marks omitted). As I have acknowledged, I think the same is true of Mr. Mayo's flight in this case. The court did not say in *Miles*, however, that Mr. Miles's flight contributed little to reasonable, articulable suspicion. *Id.* at 640-45. Moreover, the police conduct in *Miles* was far more provocative than the police conduct in the present case. According to the court's opinion in *Miles*, Mr. Miles fled after one officer followed him on foot; another officer drove up onto the sidewalk in front of Mr. Miles, blocking his path;

and then the latter officer got out of his vehicle and told Mr. Miles to stop. *Id.* at 643-44.

*Golden* and *Dozier* did not involve the issue of the degree of suspicion reasonably attributable to flight, and in both cases the police conduct at issue was far more coercive than the officers' actions in the present case. *See Golden*, 248 A.3d at 931-32, 938 (officer pulled up to curb directly in front of Mr. Golden, who was walking alone at night; another officer pulled up to curb in perpendicular manner; officer asked Mr. Golden if he had weapons; after Mr. Golden said no, officer persisted, asking Mr. Golden to show his waistband; after Mr. Golden pulled up his shirt, officer continued to persist, walking towards Mr. Golden and twice saying that he could not see Mr. Golden's waistband; and officer then frisked Mr. Golden); *Dozier*, 220 A.3d at 937-38, 941-47 (four officers in marked cruiser drove into secluded alley at night and asked to talk to Mr. Dozier, who was alone at that point; Mr. Dozier did not respond and kept walking; two officers got closer and asked again to speak with Mr. Dozier; officers were stationed so as to "substantially reduce" Mr. Dozier's freedom of movement in alley; after Mr. Dozier agreed to talk, officer asked if Mr. Dozier had any illegal weapons; Mr. Dozier said no; officer persisted, asking if he could pat Mr. Dozier down; and although Mr. Dozier said yes, court held that Mr. Dozier had been unlawfully seized before alleged consent to pat-down).

In assessing, based on common sense, whether the officers' conduct in this case was so provocative that Mr. Mayo's flight contributed little to reasonable, articulable suspicion, we also should carefully consider the conclusions reached by courts in other jurisdictions. Those courts appear to have consistently given significant weight to flight notwithstanding police conduct similar to, or even clearly more provocative than, the officers' conduct in this case. *See, e.g.*, *United States v. Wilson*, 963 F.3d 701, 702, 704 (7th Cir. 2020) (describing flight as unprovoked, where officers approached group including Mr. Wilson; one officer stood behind Mr. Wilson and another officer stood in front of Mr. Wilson; officer in front asked Mr. Wilson to stand up; and Mr. Wilson fled); *United States v. Jeter*, 721 F.3d 746, 749-50, 753-55 (6th Cir. 2013) (Mr. Jeter's flight was not provoked so as to undermine basis for investigative detention, where helicopter and several police cruisers converged on group in parking lot; one cruiser approached Mr. Jeter and officer inside asked to speak with him; Mr. Jeter did not respond and started moving away; cruiser blocked Mr. Jeter's path; officer got out of cruiser; and Mr. Jeter fled); *United States v. Ward*, 482 F. App'x 771, 772-73 (4th Cir. 2012) (per curiam) (Mr. Ward fled after officers pulled up beside him and asked him if he had gun; court describes flight as "unprovoked"); *In re D.M.*, 781 A.2d 1161, 1162, 1164-65 (Pa. 2001) (D.M. fled after officer got out of car and told D.M. to come over; court rejects argument that flight was "precipitated by unjustified police conduct"); *State v. Law*,

112 So. 3d 611, 612-14 (Fla. Dist. Ct. App. 2013) (per curiam) (Mr. Law's flight was not provoked where officer said, "Hey, police, come here, man what are you doing?"; Mr. Law said everything was fine; officer approached; and Mr. Law fled) (brackets omitted); *see also United States v. Lawson*, 233 F. App'x 367, 370 (5th Cir. 2007) ("An attempt to initiate a consensual encounter on the street does not constitute provocation . . . .").

The opinion of the en banc court dismisses these contrary cases in a footnote, *supra* at 45-46 n.15, but it seems telling that the opinion for the en banc court does not cite (and I have not found) any case from any court that has held that flight contributed little to reasonable, articulable suspicion because the flight was preceded by police conduct comparable to the conduct of the officers in this case. The opinion for the en banc court does cite *State v. Nicholson*, 188 S.W.3d 649 (Tenn. 2006), but that case (1) explicitly rested its holding on the Tennessee Constitution, *id.* at 661-62; (2) did not say that the flight evidence in that case contributed little to reasonable, articulable suspicion, *id.*; and (3) is factually distinguishable, because the sole bases for the stop supported by the record were (a) testimony that the stop occurred in the area around a housing project that the police were investigating for gang activity; and (b) the defendant fled after an officer said "hold up," *id.* at 660.

The absence of any authority from other courts supporting the conclusion that Mr. Mayo's flight contributed little to reasonable, articulable suspicion leaves me skeptical that the en banc court's analysis of this issue reflects a "commonsense, nontechnical [approach] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Ornelas*, 517 U.S. at 695 (internal quotation marks omitted).

In treating Mr. Mayo's flight as contributing little to reasonable, articulable suspicion, the opinion of the en banc court takes into account not only the conduct of the officers during the incident, but also broader contextual considerations, such as general concerns about over-aggressive police conduct, particularly in highly policed communities and among particular groups. *Supra* at 46-51. I agree that, as a matter of common sense, reasonable police officers and judges should be aware of such considerations, and should take them into account when determining the weight to be given to flight. Where I part company with the en banc court, however, is that the Supreme Court in *Wardlow* gave substantial weight to flight notwithstanding Justice Stevens's separate opinion, which highlighted those precise considerations. *Compare Wardlow*, 528 U.S. at 124-26 (giving substantial weight to evidence of flight), with *id.* at 132-34 (Stevens, J., concurring in part and dissenting in part) ("Among some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent, but,

with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence."). In my view, we as a lower court therefore are not free to treat such general considerations as rendering flight evidence of little significance. I also note that although the opinion of the en banc court cites several decisions that support taking such considerations into account in assessing the weight to be given to flight evidence, *supra* at 46-47, the opinion of the en banc court cites no case (and I am aware of no case) adopting the view that such general considerations can appropriately be viewed as reducing flight evidence to having little significance.

Finally, the opinion of the en banc court also rests on the prior actions and "reputation" of the GRU. *Supra* at 47-51. In support of its reasoning, the en banc court relies in part on evidence introduced at the suppression hearing in this case, such as that GRU "often" patrolled the "area" in which the stop occurred. *Id.* at 48. Such evidence could perhaps be called "general locational criminal-enforcement evidence." *Cf. id.* at 51-61 (discussing "high-crime evidence," which the opinion of the en banc court relabels as "general locational crime evidence"). I tend to agree that information about prior law-enforcement activities in an area, when known to the officers who conduct a stop, is at least potentially relevant to the weight the officers (and reviewing courts) should reasonably give to an individual's flight. I note, however, how limited such evidence was in this case. For example,

Sergeant Jaquez did not precisely define the area that was often patrolled and did not specify what he meant by "often." As I will try to explain *infra*, the willingness of the en banc court to rely heavily on that limited evidence in assessing the weight to be given to flight seems to me inconsistent with the far more stringent approach the opinion of the en banc court takes to "general locational crime evidence."

The en banc court also relies on a few judicial decisions from other cases to support the idea that the GRU has a "reputation for being aggressive." *Supra* at 48. The en banc court then reasons that a reasonable GRU officer should be aware of the GRU's "reputation" and that the GRU's "reputation" therefore must be taken into account in assessing the weight to be given to flight evidence in this case. *Id.* at 48-51. I do not believe that the cited decisions adequately establish, as a matter of common sense that did not require evidentiary support at the suppression hearing, that GRU officers should be aware that the GRU has a general reputation for aggressiveness that might make it significantly more likely that an innocent individual would flee to avoid interacting with officers who the individual believed were in the GRU, as opposed to other law-enforcement officers. Rather, it seems to me that the en banc court is effectively making an appellate finding of fact about the GRU's "reputation," by taking judicial notice of statements in a few decisions in other cases. Appellate courts are not in the business of finding facts. *See, e.g.,* *V.C.B. v. United States*, 37 A.3d 286, 291 (D.C. 2012) ("It is incumbent upon us, in

this case as in any other, to eschew appellate fact-finding . . . .") (internal quotation marks omitted). More broadly, an appellate court surely could not uphold a stop by relying in part on the idea that the neighborhood where the stop occurred had a "reputation" for illegal gun activity, as shown not by evidence at the suppression hearing but rather by a few judicial decisions in other cases. I do not see why the GRU's "reputation" should be treated differently. Here too the approach of the en banc court seems to me inconsistent with the quite stringent approach the en banc court takes to "general locational crime evidence."

Even assuming that the GRU's "reputation" should be taken into account, however, I do not believe that consideration of that "reputation," either alone or in combination with the other considerations present in this case, adequately supports a conclusion that Mr. Mayo's flight contributed little to reasonable, articulable suspicion.

In sum, I agree with the opinion of the en banc court that, in the circumstances of this case, Mr. Mayo's flight was significantly less suspicious than Mr. Wardlow's flight in *Wardlow*. I do not agree, however, that in the circumstances of this case Mr. Mayo's flight, considered in isolation, contributed little to reasonable, articulable suspicion. To be clear, I do not suggest that the particular record in this case "cannot inform an understanding of Mr. Mayo's flight." *Supra* at 49-50 n.17.

Rather, I conclude that the particular record in this case, properly understood, does not support a conclusion that Mr. Mayo's flight, considered in isolation, added little to reasonable, articulable suspicion.

### E. "High-Crime Area" Evidence in General

The opinion of the en banc court addresses the significance of evidence about prior criminal activity in the Kenilworth neighborhood *supra* at 51-61. The opinion begins its discussion by abandoning as unhelpful the label "high-crime area" and replacing that label with the label "general locational crime evidence." *Id.* at 51. I have no objection to that terminological shift. I also agree with the en banc court on a number of other general points about such evidence: (1) evidence that a stop occurred in an area with a "high" general crime rate is not by itself close to sufficient to support reasonable, articulable suspicion; (2) more specific and concrete evidence about prior criminal activity in the area of a stop will contribute more substantially to reasonable, articulable suspicion, and more general and abstract evidence will contribute less substantially; (3) general locational crime evidence is often presented in a vague and/or conclusory fashion; and (4) placing undue weight on general locational crime evidence can raise important concerns of fairness.

The decision of the court at the division stage stated that some of our prior decisions appear to have given substantial weight to "vague or conclusory"

testimony about prior criminal activity in an area. *Mayo*, 266 A.3d at 265 & n.26. I agree, and I agree that in future cases the trial court and this court should not give undue weight to general locational crime evidence that is too vague or conclusory, just as courts should not give undue weight to any testimony that is too vague or conclusory.

I do not, however, agree with the statement in the opinion of the en banc court that, "to be of value in a reasonable, articulable suspicion analysis, information about crime in the area must be particularized as to the location or geographic area at issue, the criminal activity known to occur in the area, and the temporal proximity of the criminal activity known to occur in the area to the time of the stop." *Supra* at 57 (internal quotation marks omitted). I agree that the presence or absence of such particularity can be quite relevant to the proper weight to give to general locational crime information. In my view, however, binding Supreme Court authority precludes this court from imposing such particularity as a rigid prerequisite before such information may be given any weight at all in a totality-of-the-circumstances analysis. (I will explain in more detail *infra* why I believe that such a requirement is specifically inconsistent with the Supreme Court's decision in *Wardlow*.)

Moreover, a number of courts have declined to impose rigid prerequisites to the consideration of general locational crime evidence. *See, e.g., United States v.*

*Weaver*, 9 F.4th 129, 151 n.86 (2d Cir. 2021) (en banc) (on question whether stop occurred in high-crime area, "First-hand knowledge of police officers who regularly patrol the relevant area is one logical source of evidence. Statistical data may likewise be offered—by the prosecution or the defense—but it is certainly not required.") (citation omitted); *United States v. Guardado*, 699 F.3d 1220, 1223 (10th Cir. 2012) ("[Mr. Guardado] argues that the term 'high-crime area' is dangerously vague because 'there is not an objective method for determining if the officer's assertion is true.' Whatever merit there is to Mr. Guardado's argument, the Supreme Court—and accordingly, this circuit—continues to consider an area's disposition toward criminal activity as a factor that contributes to an officer's reasonable suspicion.") (citation omitted); *United States v. Baskin*, 401 F.3d 788, 793 (7th Cir. 2005) ("[Mr.] Baskin contends that the government must produce 'specific data' establishing that a location is a 'high-crime area' for this inference of criminality to be drawn from the defendant's flight. He, however, identifies no decisions by this court in support of that proposition."); *cf. State v. Genous*, 961 N.W.2d 41, 44 n.4 (Wis. 2021) (rejecting argument that court should "employ [its] supervisory authority to create evidentiary prerequisites for circuit courts considering" whether stop occurred in high-crime area).

There are decisions that conclude that the evidence presented in a given case failed to adequately support a conclusion that a stop occurred in a "high-crime area,"

but as far as I have been able to determine, those decisions involve testimony quite a bit weaker than the testimony in the present case. *See, e.g.*, *State v. Goldsmith*, 277 A.3d 1028, 1040-41 (N.J. 2022) (inadequate evidence that stop occurred in high-crime area, where officer testified that area was known for weapons and shootings, and was open-air drug market, but provided no basis for those statements other than that officer had made unspecified number of fugitive arrests in area and had seen five to ten drug transactions in area, presumably over officer's twenty years of service); *People v. Harris*, 957 N.E.2d 930, 936-38 (Ill. App. Ct. 2011) (inadequate evidence that stop occurred in "high-crime area" where officer agreed when asked if area of stop "was known to be one of high burglaries and high robberies"; no other evidence was introduced about meaning of or basis for that statement; and trial court "rejected" officer's response) (internal quotation marks omitted); *D.R. v. State*, 941 So. 2d 536, 537-38 (Fla. Dist. Ct. App. 2006) (inadequate evidence that stop occurred in high-crime area where officer testified that he had not worked in area "for awhile" but that "there's multiple narcotics complaints that go out there") (internal quotation marks omitted).

## F. The General Locational Crime Evidence in *Wardlow*

When assessing the weight to be given to Sergeant Jaquez's general locational crime evidence in this case, the Supreme Court's decision in *Wardlow* is an obvious

point of comparison. The Supreme Court described the general locational crime evidence in *Wardlow* as follows. Officers were "converging on an area" that was "known for heavy narcotic trafficking." 528 U.S. at 121. The officers "expected to find a crowd of people in the area, including lookouts and customers." *Id.* While driving, the officers saw Mr. Wardlow "in" the "area." *Id.*

That evidence is quite limited in particularity. There is no indication of the size of the "area" at issue, of what the term "heavy" meant, or of the basis for the conclusion that the area in fact was an area of heavy narcotics trafficking. Justice Stevens's separate opinion emphasized the limitations of the evidence. 528 U.S. at 137-39 (Stevens, J., concurring in part and dissenting in part). After going through the underlying testimony in detail, Justice Stevens's opinion pointed out that it was unclear whether Mr. Wardlow was even in the undefined "area" of "heavy narcotics trafficking." *Id.* at 137-38. On that precise point, the Court in *Wardlow* apparently concluded otherwise, repeatedly describing Mr. Wardlow as having been "in" the unspecified "area" known for heavy trafficking. *Id.* at 121, 124. Justice Stevens's opinion went on to explain, however, that the case would have been quite different if "the officers had credible information respecting that specific street address which reasonably led them to believe that criminal activity was afoot in that narrowly defined area." *Id.* at 138 n.16. The opinion for the court in *Wardlow* expressed no disagreement with Justice Stevens's statement that there was no credible information

indicating that criminal activity was afoot at the specific street address where Mr. Wardlow was seen. *Id.* at 121-26.

The general locational crime evidence in *Wardlow* would clearly flunk the particularity requirement imposed by the opinion for the en banc court in this case. Among other things, the general locational crime evidence in *Wardlow* entirely lacked geographical and temporal specificity. According to the reasoning of the en banc court, that evidence therefore should not have been given substantial weight in determining whether the stop of Mr. Wardlow was supported by reasonable, articulable suspicion. The Supreme Court in *Wardlow*, however, clearly did give the general locational crime evidence substantial weight. The Court gave only two reasons for upholding the stop of Mr. Wardlow: Mr. Wardlow's presence in a "high-crime area," 528 U.S. at 124, and Mr. Wardlow's unprovoked headlong flight, *id.* at 124-25. The Court did not indicate the precise weight it was giving to each factor, but it is clear that both factors figured significantly in the Court's holding. *Id.* at 121-26.

For the foregoing reasons, I conclude that *Wardlow* unambiguously forecloses the approach to general locational crime evidence taken by the opinion for the en banc court in this case.

On a more specific point, I disagree with the way in which the opinion of the en banc court refers to the general locational evidence in *Wardlow*. According to the opinion of the en banc court, Mr. Wardlow was present "at a *particular* location where . . . drug activity was anticipated." *Supra* at 53 (emphasis added). For the reasons previously noted, I see no basis in *Wardlow* for the statement that drug activity was anticipated at the particular location where the police saw Mr. Wardlow. To the contrary, at best Mr. Wardlow was somewhere in an unspecified "area" in which drug activity was anticipated. When the general locational crime evidence in *Wardlow* is accurately described, it is clear that the approach adopted by the en banc court in this case would require that such evidence in *Wardlow* could not properly have been treated as a substantial factor supporting a determination of reasonable, articulable suspicion. I therefore conclude that the en banc court lacks authority to adopt such an approach.

## G. The General Locational Crime Evidence in this Case

To recap, Sergeant Jaquez testified that in the preceding three years, the GRU had recovered narcotics and ten or more guns from the Kenilworth area, which was "one of the . . . higher amounts," compared to other areas of the city. *Supra* at 68, 73. The opinion of the banc court concludes that Sergeant Jaquez's testimony was not "objectively useful," "lacked meaningful specificity," and was not "sufficiently

specific or well-grounded to place Mr. Mayo's innocuous conduct in a different light or make his flight more indicative of consciousness of guilt." *Supra* at 58-59, 61. I disagree.

Sergeant Jaquez's testimony about prior criminal activity in the Kenilworth neighborhood had limitations, as testimony often does, but that testimony seems to me plainly relevant and by no means so conclusory or lacking in meaningful specificity as to warrant outright rejection as not being objectively useful. Sergeant Jaquez's testimony compares quite favorably to the general locational crime evidence in *Wardlow*, which as previously noted lacked any numerical, temporal, or geographical specificity. The Supreme Court in *Wardlow* nevertheless gave significant weight to the evidence of prior crime in the area. 528 U.S. at 121-26. In my view, *Wardlow* thus squarely contradicts the holding of the en banc court in this case.

More generally, the opinion of the en banc court cites no decision from any other court holding that testimony comparable to that of Sergeant Jaquez had no value in determining whether there was reasonable, articulable suspicion. I am not aware of any such case, and many cases take a contrary approach. *See, e.g.*, *supra* at 96-98 (citing cases). The opinion for the en banc court does cite *United States v. Montero-Camargo*, 208 F.3d 1122, 1139 (9th Cir. 2000) (en banc). *Supra* at 57-58.

In that case, the Ninth Circuit upheld reliance on general locational crime evidence about an unpopulated spot in the desert as a factor supporting a determination of reasonable, articulable suspicion. 208 F.3d at 1138-39. In language that was arguably dicta, the court did suggest that the "high-crime area factor" must always be more particularized than a reference to a "neighborhood." *Id.* at 1138 (internal quotation marks omitted). The court cited no case support for that comment, which in my view cannot be squared either with the decisions cited *supra* at 96-98 or with *Wardlow*'s giving of substantial weight to evidence that the stop occurred in a high-crime area of unspecified size.

In sum, the absence of support in the decisions of other courts for the approach adopted by the en banc court in this case leads me to conclude that the opinion for the en banc court has departed from the path of "commonsense, nontechnical" reasoning that the Supreme Court has directed us to follow. *Ornelas*, 517 U.S. at 695.

## H.  The Totality of the Circumstances in this Case

Although this court has said that "case matching is of limited utility" in deciding Fourth Amendment issues, *Gomez v. United States*, 597 A.2d 884, 889 (D.C. 1991), the court has also recognized that prior "cases are helpful illustrations of the factors that may add up to reasonable suspicion in the totality of the

circumstances," *Hampleton v. United States*, 10 A.3d 137, 144 n.9 (D.C. 2010). Particularly given that we are tasked with using our common sense in deciding the issue before us, I believe that it is important to respectfully consider other decisions that have considered that issue in analogous circumstances.

I dissented as a member of the division because this court had previously held in *Wilson v. United States*, 802 A.2d 367 (D.C. 2002), that officers had reasonable, articulable suspicion for a stop in circumstances that in my view were similar to, but weaker than, the circumstances of this case. *Mayo*, 266 A.3d at 273-74 (McLeese, J., dissenting). Now that we are sitting en banc, however, we are not bound by the holding in *Wilson*. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971). I agree with the opinion of the en banc court that *Wilson* was incorrectly decided.

In *Wilson*, two detectives in plain clothes went into a block described as having "a high level of narcotics activity." 802 A.2d at 368 (internal quotation marks omitted). They saw two men, one of whom was Mr. Wilson, walking toward an apartment building. *Id.* The two men looked at one of the detectives and then quickened their pace. *Id.* The detective walked toward the men, who entered the building at a hurried pace. *Id.* Other police officers happened to be in the building for unrelated reasons, and one of them saw Mr. Wilson and his companion being followed by the two detectives. *Id.* Mr. Wilson and his companion hurried around

a corner, after which the officers heard frantic banging on a door. *Id.* When the officers turned the corner, they saw Mr. Wilson and his companion. *Id.* Mr. Wilson's companion appeared agitated. *Id.* Officers detained both of them. *Id.*

In my view, the circumstances in *Wilson*, as described in the opinion in *Wilson*, were not sufficient to make it reasonable for the police to seize Mr. Wilson. Mr. Wilson and his companion did not flee. Although the behavior of Mr. Wilson and his companion could reasonably be viewed as somewhat evasive, that behavior seems to me substantially less suspicious than headlong flight. The general locational crime evidence in *Wilson*, as described in the court's opinion, was simply that the stop occurred in a block that had "a high level of narcotics activity." 802 A.2d at 368 (internal quotation marks omitted). There was no explanation of what "high" meant or what the basis for the characterization was. *Id.* I do not discount that evidence altogether, but its limitations lead me to conclude that, even in combination with the evasive behavior the officers observed, the officers lacked reasonable, articulable suspicion.

The Supreme Court's decision in *Wardlow* is another natural point of comparison for purposes of assessing the totality of circumstances in this case. I do not agree with the en banc court's statement that "this case is nothing like *Wardlow*." *Supra* at 41. I have already explained one of my reasons for disagreeing. The

opinion of the en banc court describes *Wardlow* as a case in which Mr. Wardlow was present "at a particular location where . . . drug activity was anticipated." *Supra* at 53. I do not view that description as accurate. *Supra* at 98-101.

A second point of disagreement arises from the statements of the en banc court that Mr. Wardlow was holding an opaque bag. *Supra* at 38 & n.12, 41, 52. That is true factually. *Wardlow*, 528 U.S. at 121-22. The difficulty is that the Supreme Court did not rely on that fact, or even mention that fact, when explaining why the circumstances in *Wardlow* sufficed to establish reasonable, articulable suspicion. *Id.* at 123-26. We have previously held that Mr. Wardlow's possession of an opaque bag "played no part in the Court's reasoning" in *Wardlow*. *Wilson*, 802 A.2d at 371. In my view, that holding was correct. The Supreme Court gave two reasons for its decision, and Mr. Wardlow's possession of an opaque bag was neither of them. I do not believe that it is permissible for a lower court to take the view that the Supreme Court's holding rests also on a third reason that the Supreme Court did not identify as such and thus necessarily did not justify as a reason.

As I acknowledged at the division stage, several subsequent decisions of this court have treated the Supreme Court's holding in *Wardlow* as resting in part on Mr. Wardlow's possession of an opaque bag, without addressing *Wilson*'s contrary holding. *Mayo*, 266 A.3d at 282 (McLeese, J., dissenting). Now that we are sitting

en banc, the court is in a position to resolve this conflict in our decisions. In my view, the en banc court resolves that conflict incorrectly.

The en banc court expresses doubt that the Supreme Court would have mentioned the opaque bag in the fact section of its opinion unless the Supreme Court considered the opaque bag as part of the totality of the circumstances that supported the stop in *Wardlow*. *Supra* at 38-39 n.12. I do not find that reasoning persuasive. In background factual sections describing the circumstances of a case, opinions often include factual details that the opinion does not rely upon as a basis for the opinion's legal conclusions. For example, the opinion of the en banc court in this case mentions in the background factual section of the opinion facts such as that the police did not start using body-worn cameras until a year after Mr. Mayo's arrest and that the man with whom Mr. Mayo interacted briefly was in a wheelchair near a dumpster. *Supra* at 5, 6. In my view, it would be absurd to suggest that the mere inclusion of those facts in the en banc court's factual description of this case gives rise to an inference that the en banc court is implicitly relying on those facts as legally relevant to whether the police had reasonable, articulable suspicion to seize Mr. Mayo.

As previously noted, the opinion of the Court in *Wardlow* did not mention the opaque bag at all when explaining the basis for its holding that the police had

reasonable, articulable suspicion to seize Mr. Wardlow. 528 U.S. at 123-26. Justice Stevens's opinion concurring in part and dissenting in part did mention the opaque bag in its legal analysis, stating that "there [was] nothing at all suspicious" about the fact that Mr. Wardlow was holding an opaque bag. *Id.* at 139. The opinion of the Court did not take issue with that statement. I think it is clear that the Supreme Court in *Wardlow* was not secretly relying on Mr. Wardlow's possession of an opaque bag as an unstated third factor supporting the Court's holding that the police had reasonable, articulable suspicion to seize Mr. Wardlow.

The en banc court's effort to distinguish *Wardlow* on this basis also seems to me to be inconsistent with the reasoning of the en banc court in this case. The opinion of the en banc court concludes that Mr. Mayo's inferred hand motions near his waistband did not "provide much, if any, support" for reasonable, articulable suspicion, because those motions were innocuous, "consistent with mundane behavior," and "capable of too many innocent explanations." *Supra* at 31 (internal quotation marks omitted). Those descriptions seem at least as applicable to Mr. Wardlow's possession of an opaque bag, and the opinion of the en banc court does not contend otherwise. I do not understand how the en banc court can reasonably distinguish *Wardlow* on the basis of a fact that the Supreme Court did not rely on its analysis and that, under the reasoning of the en banc court, would not

"provide much, if any, support" for a finding of reasonable, articulable suspicion. *Supra* at 31.

In my view, *Wardlow* is rather similar to the present case. On one hand, as I have already indicated, *see supra* at 86-90, I view the flight evidence in this case as significantly weaker than the flight evidence in *Wardlow*, where the flight was apparently caused merely by the presence of police in the area. On the other hand, as I also have already indicated, *see supra* at 101-03, I view the general locational crime evidence in this case as somewhat stronger than the analogous evidence in *Wardlow*. The circumstances in this case also include Mr. Mayo's arm movements, which in my view add some but not much to the overall picture.

If I believed that the grounds supporting a stop in this case, taken as a whole, were as strong as or stronger than those in *Wardlow*, I would be obliged to uphold the stop, and my analysis could stop there. Although I view this as a close call, however, I conclude that the grounds supporting a stop in this case were on balance somewhat weaker than those in *Wardlow*. The question then becomes how much weaker can such grounds be while still being sufficient to justify a *Terry* stop? In trying to answer that question, I take substantial guidance from other decisions from around the country involving circumstances that seem to me roughly comparable to the circumstances of this case.

As far as I have been able to determine, those decisions have consistently upheld the legality of the stops at issue. *See, e.g.*, *Jeter*, 721 F.3d at 749-50, 753-55 (upholding legality of stop where helicopter and several police cruisers converged on group in parking lot; one cruiser approached Mr. Jeter and officer inside asked to speak with him; Mr. Jeter did not respond and started moving away; cruiser blocked Mr. Jeter's path; officer got out of cruiser; Mr. Jeter fled; Mr. Jeter grabbed pocket while running; and stop occurred in area from which police had received many complaints relating to robberies, thefts, drug activity, and loitering); *United States v. Smith*, 633 F.3d 889, 891, 893-94 (9th Cir. 2011) (upholding legality of stop where, assuming truth of Mr. Smith's testimony, officer activated siren and repeatedly directed Mr. Smith to "come stand in front of the car"; Mr. Smith asked whether he was under arrest and was informed that he was not; Mr. Smith turned and ran when officer reached for what Mr. Smith thought was a gun; and it was undisputed that flight occurred in "high-crime neighborhood"); *United States v. Bridges*, 382 F. Supp. 3d 62, 64-70 (D.D.C. 2019) (upholding legality of stop where GRU officers drove into area with "large amount of drug dealing"; firearm-related incident had reportedly occurred earlier that day or night before; as officers arrived, someone yelled word officers believed was code to indicate presence of police; Mr. Bridges started walking toward officers; officer asked Mr. Bridges if everything was good; Mr. Bridges did not respond; and Mr. Bridges fled as officer got out of car) (internal

quotation marks omitted); *United States v. Jones*, 609 F. Supp. 2d 113, 124 (D. Mass. 2009) (upholding legality of stop where Mr. Jones was riding his bicycle in "high crime area"; Mr. Jones sped up after seeing cruiser following him; Mr. Jones refused to stop when directed to do so; and Mr. Jones instead fled); *McGee v. State*, 818 So. 2d 558, 558-59 (Fla. Dist. Ct. App. 2002) (upholding legality of stop where officers saw Mr. McGee standing in alley; Mr. McGee was in alley "known for heavy narcotics trafficking"; officers approached to ask Mr. McGee his name and why he was in alley; and Mr. McGee fled).

With one exception that I will discuss below, I am not aware of any case comparable to this case in which another court has held a stop to be illegal. The opinion of the en banc court cites five cases as providing support for the court's holding. *Supra* at 64-65. Four of those cases seem to me to involve circumstances quite a bit weaker than those of the present case. *See United States v. Conerly*, 75 F. Supp. 3d 1154, 1161-65 (N.D. Cal. 2014) (invalidating stop where Mr. Conerly fled after police told him to stop; trial court found as matter of fact that area of stop was not shown to have been high-crime area); *Monjaras v. State*, 679 S.W.3d 834, 847-49 (Tex. App. 2023) (invalidating stop where Mr. Monjaras was in "high-crime" area, avoided eye contact, and appeared nervous, but there was no evidence that Mr. Monjaras fled); *Harris*, 957 N.E.2d at 933-38 (invalidating stop where officers drove in direction of Mr. Harris; Mr. Harris attempted to hide behind car;

officers got out, identified themselves, and walked toward Mr. Harris; Mr. Harris fled; and there was inadequate evidence that stop occurred in "high-crime area"); *D.R. v. State*, 941 So. 2d at 537-38 (invalidating stop where D.R. was walking down street; officers drove alongside; D.R. fled; and there was inadequate evidence that stop occurred in "high crime area").

The fifth case cited by the en banc court is *McKinney v. State*, 444 S.W.3d 128, 130-34 (Tex. App. 2014). The court there seems to have applied a flat rule that "[a] person running at the sight of a patrol vehicle in a high crime area, in and of itself, does not give an officer reasonable suspicion to conduct an investigatory detention." *Id* at 134. In my view, that flat rule is contrary to the Supreme Court's decision in *Wardlow*, a decision that the court in *McKinney* remarkably did not even mention. *Id.* at 130-34.

The near-complete absence of any decision from any other court invalidating a search in circumstances comparable to those of the present case gives me substantial pause. In light of the foregoing, and applying, as best I can, a commonsense, nontechnical approach, I would hold that the seizure of Mr. Mayo was lawful. I therefore respectfully dissent.